[No. E008501. Fourth Dist., Div. Two. Jan. 21, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
DUANE KEITH FITZPATRICK, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, IV and VI.

**COUNSEL**

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Rudolf Corona, Jr., and Rhonda L. Cartwright, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

DABNEY, Acting P. J.—A jury convicted defendant Duane Keith Fitzpatrick of first degree murder (Pen. Code, § 187)[1] and found that he was armed with and personally used a firearm (§§ 12022, subd. (a), 12022.5). On appeal (*People* v. *Fitzpatrick* (Mar. 13, 1989) E004739, [nonpub. opn.]), this court reversed the judgment on the ground that erroneous jury instructions on implied malice had been given. The matter was remanded for retrial.

On retrial, a jury again convicted Fitzpatrick of first degree murder and found the armed and use allegations to be true. The court sentenced him to a two-year determinate term for the use of a firearm, a consecutive indeterminate term of twenty-five years to life for the murder, and stayed a one-year term for the armed allegation.

On appeal, Fitzpatrick contends the trial court erred in: (1) instructing the jury on the theory of murder by lying in wait; (2) instructing the jury with CALJIC No. 8.73 instead of Fitzpatrick's requested modified instruction; (3) improperly instructing the jury on the order in which it should consider charges during deliberations; (4) giving an improper pinpoint instruction; and (5) refusing to allow Fitzpatrick to raise issues in support of his motion for new trial when those issues were not included in the written motion. Fitzpatrick also contends the prosecutor misstated the law during argument, and defense counsel's failure to object constituted ineffective assistance of counsel.

### FACTS

On April 25, 1986, about 9 p.m., Robert Lee Bolinger drove with his girlfriend, Raquel Duronslet, to an alley in Montclair to buy some marijuana. Several young men, including Fitzpatrick, approached the car. Bolinger held out a $10 bill and asked one of the men about buying marijuana. The man, later identified as Dennis Mann, grabbed the $10 bill and disappeared through an iron gate between two apartment buildings near the car.

Bolinger got out of his car holding a metal pipe. He ran after Mann and angrily demanded his money back. He stopped at the gate and hit it numerous times with the pipe. Bolinger yelled at someone to "tell the fucking nigger to give me my ten bucks back." Someone replied that a White boy should not be there.

Fitzpatrick, who was standing nearby, told Bolinger, "You'd better get out of my face." Someone told Bolinger he had better move on before he got

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

shot. Bolinger responded, "Who's going to shoot me? You?" Someone replied, "If I have to." One witness testified that Bolinger said, "I'll kill you, you fucking niggers," while he was standing at the fence. Bolinger appeared drunk and was staggering.

Bolinger went inside the gate and talked with someone near the door of an apartment. Bolinger walked down the alley past two apartment complexes, shouting and hitting things with the pipe. He then returned to the gate, four or five minutes after the conversation about shooting someone. Witnesses reported hearing between two and eight gunshots. A neighbor heard the shots coming from Fitzpatrick's balcony.

Bolinger dropped to his knee, and then got up and staggered into a nearby field, where he fell. He had been struck in the upper back by two bullets. One of the shots killed him by causing a hemorrhage in his lung. An autopsy revealed that he had a blood-alcohol level of .11 percent.

After Bolinger got out of the car, Duronslet yelled at him to get back in and forget the money. He refused and told her to leave. Duronslet was afraid, so she drove to a convenience store, back to the alley, where she saw nothing, and to a liquor store. About five to eight minutes after she first left, she returned to the alley and learned that Bolinger had been shot.

The day after the shooting, Sean Mitchell asked Shirley Thomas, Fitzpatrick's neighbor, to keep a gun for Fitzpatrick in exchange for some cocaine. Thomas went to Fitzpatrick's apartment and was given a shotgun or rifle. She put the gun inside her pants, took it home and hid it in a closet.

A day or two later, Fitzpatrick and some friends came to Thomas's apartment to get the gun. They borrowed a hammer and a laundry room key and left with the gun. Thomas and her daughter then heard pounding sounds from the laundry room. Thomas kept the gun case and later gave it to the police.

Thomas asked Fitzpatrick whether the gun had been used in the killing. Fitzpatrick explained that "the white guy had tried to do something to him or some of the . . . black guys that was in the block with an iron pipe, and he got him first."

Fitzpatrick gave Sharon Perkins, Thomas's daughter, a box which contained bullets and asked her to get rid of it. Perkins put the box in a dumpster.

Fitzpatrick told Perkins that he had not meant to kill Bolinger; he had just intended to scare him. He explained that Mann had taken something from Bolinger's hand, and Bolinger had said something to Fitzpatrick. Fitzpatrick then went upstairs, got his gun, lay down on his patio, and fired the gun.

Sean Mitchell was with the group of men in the alley when Bolinger drove up. Mitchell saw Mann snatch Bolinger's money and run. Bolinger started cussing, and Fitzpatrick told Bolinger to get out of his face. Fitzpatrick then went upstairs to his apartment. Mitchell joined Perkins on the stairs and started talking to her. He heard gunshots which seemed to be coming from Fitzpatrick's apartment. Mitchell went downstairs and saw Bolinger going through a dirt field holding his chest.

Mitchell returned back upstairs and met Fitzpatrick. Fitzpatrick said "the dude wasn't no punk white boy" and "he had to be tooken out." Fitzpatrick said he was going to throw the gun in the gutter at Ramona Avenue and Holt Boulevard. Pieces of a rifle were located in a nearby storm drain catch basin.

Officers executed a search warrant at Fitzpatrick's apartment in July 1986. They located a shell casing in a crack at the base of the balcony wall. It was 45 to 55 feet from Fitzpatrick's balcony to where Bolinger had been shot.

When Fitzpatrick was arrested, he told a friend, "They got me for the murder." The officers had not yet told him why he was being arrested.

*Defense.* Annie Crossley testified that she was sitting on a balcony overlooking the alley. She saw a car pull up and stop; people came up to the car; and a man got out of the car, yelling that he wanted his money. He held something in his hand which he hit against the fence. The man never hit anyone with the pipe.

When she heard the gunshots, she did not see anyone on the patio across the alley. She had no idea where the shots came from. The man with the pipe was then standing right by the gate.

Trina Hawkins testified that Fitzpatrick said he had shot Bolinger because "he was afraid the white guy was going to either hurt him or his family," and Fitzpatrick had to shoot him because he was threatening Fitzpatrick with a pipe.

## DISCUSSION

### I

### *Lying-in-wait Instruction*

■ Fitzpatrick contends the court erred in instructing the jury with CALJIC No. 8.25.[2] He argues the instruction does not accurately state the requirements for a jury to find murder by lying in wait because the instruction omits the requirement that the waiting be for a substantial period. (*People* v. *Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244].)

■ The People contend the issue of instructional error was not raised in the trial court and was therefore waived, citing *People* v. *McNeill* (1980) 112 Cal.App.3d 330, 340 [169 Cal.Rptr. 313] and *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 19 [147 Cal.Rptr. 208]. *McNeill* and *Martinez* deal with the defendant's duty to request clarification of instructions which are otherwise correct statements of the law, and are therefore not on point.

Section 1259 provides, "The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." If the challenged instruction misstated the law as to the requirements for finding first degree murder by lying in wait, Fitzpatrick's substantial rights were affected. We thus address the issue on the merits.

In *Morales*, the Supreme Court announced that the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) requires three elements: (1) a concealment of purpose; (2) a *substantial period* of watching and waiting for an opportune time to act; and (3) a surprise attack on an unsuspecting victim immediately after the watching and waiting. (*Morales, supra,* 48 Cal.3d at p. 557.) In contrast, CALJIC No. 8.25 states that no particular period is required.[3] After the *Morales* decision, CALJIC No. 8.81.15 (5th ed. 1991 pocket pt.), which defines the special circumstance of murder while lying in

---

[2]CALJIC No. 8.25, as read to the jury, stated, "Murder which is immediately preceded by lying in wait is murder of the first degree. [¶] The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise [even though the victim is aware of the murderer's presence]. *The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.*" (Italics added.)

[3]Similarly, CALJIC No. 8.20, which discusses deliberate and premeditated murder, states: "The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate

wait, was modified by adding the three elements listed above.[4] CALJIC No. 8.25, which defines first degree murder while lying in wait, was not modified, but a use note was added: "The Committee expresses no opinion as to whether [the language from *Morales*] is also appropriate for CALJIC 8.25 inasmuch as the Supreme Court did not specifically so indicate. However, it may be something that the trial court should consider." (Use note to CALJIC No. 8.25 (5th ed. 1991 pocket pt.) p. 74.)

▇▇▇▇ After briefing was completed in this case, the California Supreme Court filed an opinion which directly addresses Fitzpatrick's contention. (*People* v. *Edwards* (1991) 54 Cal.3d 787 [1 Cal.Rptr.2d 696, 819 P.2d 436].) In *Edwards*, the court indicated that instructions on first degree murder by lying in wait need not use the specific language of *Morales*. The defendant in *Edwards* contended that the instruction given was defective because it did not state that a "substantial period" of lying in wait was required. The court responded, "[T]he jury was told that the lying in wait must be of sufficient duration to establish the elements of waiting, watching and concealment or other secret design to take the victim unawares and by surprise, and that a murder done suddenly without such waiting, watching and concealment is not murder by lying in wait. These requirements necessarily include a substantial temporal element. We have never required a certain minimum period of time, only a period not insubstantial. The instructions sufficiently convey this meaning." (*Id.*, at p. 823.)

CALJIC No. 8.25, like the instruction given in *Edwards*, adequately informed the jury that the period of watching and waiting must be of sufficient duration to demonstrate the defendant's mental state equivalent to premeditation and deliberation. We find no error in giving CALJIC No. 8.25.

▇▇▇▇ Once it is established that a murder was committed, the lying-in-wait theory is used to determine the degree of a murder. The theory takes the issues of premeditation and deliberation from the jury "by the force of the statute." (*People* v. *Ward* (1972) 27 Cal.App.3d 218, 226 [103 Cal.Rptr. 671].) In *People* v. *Edelbacher* (1989) 47 Cal.3d 983 [254 Cal.Rptr. 586, 766

and premeditated. . . . [¶] The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] [she] decides to and does kill."

[4]CALJIC No. 8.81.15 (5th ed. 1991 pocket pt.) also still includes the statement, "The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation."

P.2d 1], the record did not indicate how long the defendant lay in wait. However, the court ruled that the jury could reasonably conclude from the evidence "that the killing was preceded by a period of watchful waiting and therefore was accomplished by means of lying in wait." (*Id.*, at p. 1020.) The evidence showed that the "defendant armed himself with a shotgun, was not observed on the street either before or after the shooting, and shot [the victim] from a concealed position almost immediately after she returned home." (*Ibid.*)

In *Edwards*, the court noted, "There was also evidence of a substantial period of watching and waiting. The jury could reasonably find that defendant first saw the victims as they were walking by a restroom near the entrance to the Blue Jay campground, and that he turned around and followed them. Since more than a quarter of a mile separated the spot where defendant first saw the girls and where he shot them, and they were on foot, the jury could reasonably infer that a matter of minutes elapsed from the time defendant first saw them until he shot them. This was substantial." (*Edwards, supra*, 54 Cal.3d at pp. 825-826.)

Here, Bolinger was shot five to fifteen minutes after he got out of his car. During this time, he chased the group of young men toward the courtyard of an apartment building, banged on the gate and yelled profanities and racial epithets at them. He exchanged words with Fitzpatrick at the gate, and walked up and down the alley. Fitzpatrick went upstairs to his apartment, obtained his rifle, and went onto his balcony where he lay down and aimed the rifle through a hole. A jury could reasonably conclude that Fitzpatrick concealed himself while he watched and waited to take careful aim to get the best shot at Bolinger.

## II

### CALJIC No. 8.73

Fitzpatrick contends the court erred in refusing to give his requested instruction:[5] "When the evidence shows the existence of provocation which played a part in inducing the unlawful killing of a human being, but

---

[5]Fitzpatrick raised this issue in his earlier appeal. In dicta, we rejected the argument "because no case or other authority holds that any provocation subjectively felt by the defendant, no matter how irrational or inconsiderable, suffices to reduce first degree murder to second degree murder. We believe that CALJIC No. 8.73 adequately deals with provocation sufficient only to reduce the degree of the murder. (See *People* v. *Valentine* (1946) 28 Cal.2d 121, 132 [169 P.2d 1].) At oral argument, counsel for defendant criticized CALJIC No. 8.73 as not conforming to the holding in *Valentine* because the instruction does not *require* the consideration of inadequate provocation on the issue of the degree of murder. We disagree and

where the provocation is inadequate to reduce the homicide from murder to manslaughter, before you may find the murder to be of the first degree, you must first find whether such provocation precluded premeditation and deliberation. Only when you find, beyond a reasonable doubt, that notwithstanding such provocation, the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation, may you find the defendant guilty of first degree murder. [¶] If the provocation aroused the passion of defendant sufficiently to negate premeditation or deliberation on his part, and if insufficient time elapsed between the provocation and the fatal blow for defendant's passion to subside and his reason to return, then the homicide, if murder, would be of the second degree."

Fitzpatrick bases his requested instruction on *People* v. *Valentine* (1946) 28 Cal.2d 121, 132 [169 P.2d 1]. The court held that the existence of provocation which is not adequate to reduce the crime of murder to manslaughter "may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation." (*Ibid.*)

Fitzpatrick argues that unlike his requested instruction, CALJIC No. 8.73, which was given to the jury,[6] permits, but fails to *require* the jury to consider inadequate provocation on the issue of the degree of murder. Furthermore, CALJIC No. 8.73 fails to specify the type of provocation that may negate premeditation and deliberation.

In reviewing a challenge to jury instructions, we must consider the instructions as a whole. (*People* v. *Billings* (1981) 124 Cal.App.3d 422, 427-428 [177 Cal.Rptr. 392], disapproved on another point in *People* v. *Karis* (1988) 46 Cal.3d 612, 642 [250 Cal.Rptr. 659, 758 P.2d 1189].) We assume that the jurors are capable of understanding and correlating all the instructions which are given to them. (*People* v. *Yoder* (1979) 100 Cal.App.3d 333, 338 [161 Cal.Rptr. 35].)

Here, the court instructed the jury under CALJIC No. 8.71 that if it had a reasonable doubt as to whether the murder was of the first or second degree,

---

find that the use of the word 'may' is sufficiently directive in the context of the instruction to satisfy *Valentine*'s requirement that the jury be informed of the relevance of inadequate provocation on the issue of degree." (*People* v. *Fitzpatrick, supra*, E004739.)

[6] Instead of giving the requested version, the court instructed the jury with CALJIC No. 8.73, which states, "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree."

it must give the defendant the benefit of the doubt and return a verdict of second degree murder. The jury was also instructed: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and *not under a sudden heat of passion or other condition precluding the idea of deliberation*, it is murder of the first degree." (CALJIC No. 8.20, italics added.) Finally, the jury was instructed with CALJIC No. 8.73.

Under this combination of instructions, the jury had to find premeditation and deliberation before it could return a verdict of first degree murder.[7] It also had to find that the intent to kill was not formed under a condition which precluded deliberation. The first paragraph of Fitzpatrick's proposed instruction would require the jury to consider provocation *before* considering other issues relevant to the murder charge. *Valentine*, on which defendant relies to support his proposed instruction, includes no such requirement. (*Valentine, supra*, 28 Cal.2d at page 132). Moreover, it is up to the jury to decide the order in which it considers the elements of the crimes charged. The important factor is that the jury make a finding as to each element. The instructions given required it to do so.

■■■ The People also argue that the proposed instruction was erroneous because the jury must apply an objective standard of provocation to reduce first degree murder to second degree murder, just as to reduce murder to manslaughter. As authority, the People cite *Valentine, supra*, 28 Cal.2d at page 138; *People v. Coad* (1986) 181 Cal.App.3d 1094, 1107 [226 Cal.Rptr. 386] and *People v. Ogen* (1985) 168 Cal.App.3d 611, 622 [215 Cal.Rptr. 16].

*Coad* and *Ogen* discussed the objective test for provocation required to reduce murder to manslaughter. Neither case suggested that the objective test should be applied to reduce the degree of the murder. The *Valentine* court discussed the objective test when analyzing the difference between murder and manslaughter. (*Valentine, supra*, 28 Cal.2d at p. 138.) However, in another passage, the court impliedly referred to a subjective standard of provocation to reduce the degree of the murder. (*Id.*, at pp. 131-135.) If this were not so, the provocation would be a *defense* to murder and would be sufficient to reduce the crime to manslaughter.

The issue is whether the provocation precluded the defendant from deliberating. (See CALJIC No. 8.20.) This requires a determination of the defendant's subjective state. The court in *People v. Wickersham* (1982) 32 Cal.3d

---

[7]In the alternative, as discussed above, the jury could have found first degree murder by lying in wait.

307 [185 Cal.Rptr. 436, 650 P.2d 311] impliedly referred to a subjective test: "[W]here the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately, the trial court is required to give instructions on second degree murder under this theory. The fact that heated words were exchanged or a physical struggle took place between the victim and the accused before the fatality may be sufficient to raise a reasonable doubt in the minds of the jurors regarding whether the accused planned the killing in advance." (*Wickersham, supra,* at p. 329.)

We find no error in giving CALJIC No. 8.73 instead of the requested instruction. A requirement that the jury find premeditation and deliberation necessarily includes a requirement that the jury consider the defendant's mental state. (See CALJIC No. 8.20.) No more explicit instruction was required.

### III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### V

#### *Pinpoint Instruction*

Over Fitzpatrick's objection, the jury was instructed under CALJIC No. 2.06 as follows: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

Fitzpatrick contends the only evidence this instruction related to was his attempts to get rid of the gun. He argues the instruction was thus an improper pinpoint instruction. (*People* v. *Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049].) In *Wright,* the court held that the trial court properly refused an instruction which directed the jury's attention to specific evidence relating to the accuracy of an eyewitness identification.[9] (*Id.,* at p. 1153.)

Fitzpatrick reads *Wright* far too broadly, as calling for elimination of jury instructions which focus the jurors' attention on particular categories of

---

*See footnote, *ante,* page 1285.

[9] The proposed instruction in *Wright* stated, " 'Where the prosecution has offered identification testimony, that is, the testimony of an eyewitness that he saw the defendant commit the act charged, such testimony should be received with caution. An identification by a stranger is not as trustworthy as an identification by an acquaintance. Mistaken identification is not

evidence. The actual holding of the *Wright* court was narrow: "[W]e reject the use of a special *additional and cumulative* cautionary instruction regarding the unreliability of eyewitness identification." (45 Cal.3d at p. 1154, italics added; see also *People* v. *Benson* (1990) 52 Cal.3d 754, 805, fn. 12 [276 Cal.Rptr. 827, 802 P.2d 330 [citing *Wright* for the proposition that a duplicative instruction may properly be refused].) The court further concluded that the part of the proposed instruction which admonished the jury that mistaken identification was " 'not uncommon' " was "objectionable and may properly be rejected because it 'does not state a principle of law or establish a basis for instructing a jury.' " (*Wright, supra,* at p. 1152.)

Here, the challenged instruction was not cumulative and it *does* state a principle of law. Evidence Code section 413 explicitly states, "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's . . . willful suppression of evidence relating thereto, if such be the case." The court did not err in instructing the jury on the use of evidence of destruction of evidence.

VI

*Motion for New Trial**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

McKinster, J., and McDaniel, J.,† concurred.

A petition for a rehearing was denied February 11, 1992, and appellant's petition for review by the Supreme Court was denied April 1, 1992.

---

uncommon, and careful scrutiny of such testimony is especially important.' " (*Wright, supra,* 45 Cal.3d at p. 1152, fn. 25.)

*See footnote, *ante*, page 1285.

†Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.