Filed 11/6/13  P. v. Medina CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B246519 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA120336) |
| v. | |
| DAVID MEDINA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed in part, modified in part, and remanded with directions.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendant, David Medina, of first degree murder (Pen. Code, § 187, subd. (a))[1] and two counts of attempted willful, deliberate, premeditated murder (§§ 664, 187, subd. (a).) The jury further found criminal street gang and firearm use allegations to be true. (§§186.22, subd. (b)(1)(C); 12022.53, subds. (b), (c) & (d).) The trial court found a single prior serious felony conviction and two prior separate prison term allegations were true. (§§ 667, subds. (b)-(i); 667.5, subd. (b); 1170.12.) Defendant was sentenced to 185 years to life in state prison. We affirm in part, modify in part, and remand with directions to impose or strike prior separate prison term enhancements.

## II. THE EVIDENCE
### A. The Prosecution Case
#### 1. The shootings

Defendant and Jesse Medina are brothers.[2] On October 9, 2011, defendant and Jesse Medina were in Hollywood. Defendant was a gang member, but Jesse was not. Jesse was shot and died at the hospital. The primary suspect was arrested that night and remained in custody at the time of trial. There were no other potential suspects. The suspect was not a documented gang member, but his father was a hard-core "original gangster" from a rival gang.

On October 10, 2011, defendant armed himself with a loaded weapon and rode a bicycle to a park in South Central Los Angeles. There were a number of people in the park—men, women and children. The park was frequented by members of the rival gang. Defendant approached three individuals—rival gang members Christian Perez and

---

[1] Future statutory references are to the Penal Code unless otherwise indicated.

[2] To avoid confusion, because defendant and his brother have the same surname, we refer to Jesse Medina by his first name.

Oscar Valenciano and a companion, Johanna Gonzalez. Mr. Perez had conspicuous gang tattoos. Because he was not wearing a shirt, his gang tattoos were visible to people walking past. Defendant walked up to the three individuals and uttered words disrespectful of the rival gang. He pointed the gun at Ms. Gonzalez's face from 18 inches away. Ms. Gonzalez said she "wasn't from nowhere" in response to the gun being pointed at her. Defendant then shot Mr. Valenciano and Mr. Perez. When Ms. Gonzalez heard the first gunshot, she tried to run. Defendant shot Ms. Gonzalez in the leg and hip, causing her to fall to the ground. As she lay on the ground, defendant shot her in the back. He also tried to shoot her in the head, but the gun misfired. Ms. Gonzalez heard a clicking sound. Defendant rode away on his bicycle. With police officers in pursuit, defendant threw the gun under a school bus.

Mr. Valenciano died of multiple gunshot wounds. Ms. Gonzalez underwent a hip replacement and had a metal plate in her leg. She had residual numbness in her back. Mr. Perez was shot through the knee. The injury caused him to limp.


2. The gang evidence


Detective Roberto Bourbois testified as to the rival gangs. Detective Bourbois was an experienced gang homicide investigator. Detective Bourbois was familiar with defendant's gang. It was a very small gang of about 60 members spread out across southeast Los Angeles. The gang was associated with the Mexican Mafia. The gang's primary activities included attempted murder and street robberies.

The victims' gang was one of the oldest Hispanic gangs in Los Angeles. It had been aligned with the Mexican Mafia from time to time. Gang members were found in Hollywood as well as west of downtown and other areas.

Detective Bourbois described the importance of respect in gang culture: "[T]o have respect is above all important in the gang culture. If you don't have respect, you're not much of a gang. [¶] Respect is taken. It's taken . . . through intimidating the public. It's taken through standing up to the rivals, being involved in criminal activity. That's

one of the components of what makes a gang. [¶] . . . I think respect in reality is more fear. It's an atmosphere where you create that fear in the community and, therefore, it's translated into respect. [¶] But if you don't have that respect, then you're not a gang. You can't function."

Detective Bourbois further explained that retaliation is key to maintaining respect: "[I]f an individual gang member is disrespected and he doesn't immediately get retaliation or pay back, if that doesn't happen then they lose respect not only in the eyes of their rivals but in their own gang. [¶] If you start to lose that respect, you start getting kind of out of the circle of this gang environment where you're not trusted because you're not willing to defend the honor of the gang." When a gang member uses a catch phrase to put down a rival gang member, the rival gang member is expected to retaliate. Detective Bourbois also explained that gang members, whether perpetrator or victim, do not cooperate with the authorities. A snitch will be severely hurt or killed. Community members are also expected not to cooperate with the authorities. The gang creates an atmosphere of intimidation to prevent community members from assisting law enforcement.

Defendant's gang and the victims' gang had been rivals for at least 10 years. The park where the shooting occurred was frequented by the victims' gang. Defendant had multiple gang tattoos on his head and torso, including his gang's name. He also had the initials of the gang's name tattooed on his chest covering the entire front of his torso. Detective Bourbois testified that a person who puts tattoos on his or her head and neck is demonstrating a great deal of loyalty to the gang. A day after Jesse's death, defendant got a tattoo near his eye. The tattoo was of a crossed-out number signifying the rival gang with a "K" next to it. According to Detective Bourbois, the tattoo showed defendant was an enemy of the rival gang. The K was for kill. It meant defendant wanted to harm or kill members of the rival gang.

In response to a hypothetical question tracking the facts of this case, Detective Bourbois testified in his opinion the crime was committed for the benefit of the assailant's gang. The detective relied on the following hypothetical facts: the assailant

4

and the victims were rival gang members; the park was a known rival gang hangout; if you wanted to find a member of the rival gang, you would go to that park; and the shooting itself and the manner in which it was executed elevated the status of the assailant's gang. Detective Bourbois stated there could be a revenge component to the crime. But when a gang, especially a small gang, is attacked by a rival, they must retaliate or lose respect. Factors also showing a retaliatory motive included: the rival gang was made up of pockets in different areas of the city that were associated in name only; the park was geographically distant from the location where Jesse was killed; the possibility that a gang member in the park was involved in Jesse's murder was remote; defendant's newest tattoo indicated there would be retaliation; and the two gangs were long-time rivals.

## B. The Defense Case

Witnesses testified that at the hospital, while Jesse was in surgery, defendant was acting desperate and crazy. Defendant was told Jesse was dead. Defendant then hit a window. Defendant asked the doctors whether they had done everything they could to save Jesse. After Jesse died and the family returned home, defendant's condition worsened. Defendant was seen talking to himself. Also, defendant was talking to Jesse, who as noted was dead. Defendant's sister, Evelyn Medina, testified: "He was talking to himself. And he was talking to Jesse, telling him that why did he left him, that what is he going to do now without him. [¶] And then just telling Jesse that he wasn't going to forgive him, that he told him that he wasn't going to leave him and he left him. [¶] He was saying that the reason he was doing good now was because of Jesse, and that God just took him away from him . . . ." Ms. Medina testified, "[Defendant] was saying that it should have been him, the one that had got killed, not Jesse, because he's the one that has all the tattoos and Jesse wasn't gang related."

Defendant's girlfriend of 13 years, Jessica Schufford, testified that when defendant called her from the hospital he was "hysterical" and "frantic." At the hospital, defendant

5

said to Ms. Schufford: "Jessica, they shot my brother. They shot my brother. Why would they want to shoot my brother? I was right there." Ms. Schufford described defendant's relationship with Jesse: "It was very close. [Defendant] loved [Jesse] more than anybody in the world." After Jesse was shot, defendant was unable to sleep. The inability to sleep continued until defendant was arrested. Defendant's mental condition deteriorated after Jesse was killed.

Defendant testified in his own defense as follows. He was a gang member. But Jesse was not a gang member. On the night Jesse was shot, defendant heard one of those involved yell out a number identifying the rival gang. After Jesse died, defendant was depressed and unable to sleep. He had been using crystal methamphetamine every day since before the shooting. Prior to Jesse's death, defendant had no particular hatred of the rival gang. Defendant testified he had not been "gang-banging" as he had been trying to change his life. After Jesse died, defendant got a new tattoo. This was a way to disrespect the rival gang. The only reason defendant went to the park, rival gang territory, and got the new tattoo was that Jesse had been killed.

On the day after Jesse died, defendant rode a bicycle eight blocks to get a gun from a friend's house. Carrying the loaded weapon, defendant rode aimlessly screaming out a gang slur at anyone who looked like a Latino gang member. Defendant testified he was not: thinking straight; thinking about shooting anyone; and thinking past what he was doing at the moment. Defendant testified he was angry and just mad at the world. Defendant approached the three victims in the park. One of them said something to defendant. Defendant became angry. One of the two men appeared to reach for a gun. Then in response, defendant started firing his weapon. He did not remember pulling out the gun. Defendant did not remember shooting Ms. Gonzalez. He was a little bit drunk at the time, but he was not under the influence of methamphetamine.

## III. DISCUSSION

### A. Ineffective Assistance of Counsel:  Provocation Instruction

Defense counsel, Mark Shapiro, asserted in the trial court:  defendant was not guilty of first degree murder; defendant's actions were driven by intense emotions in the aftermath of Jesse's death; in other words, defendant did not act willfully, deliberately and with premeditation.  The jury was instructed that provocation, measured objectively, can reduce an intentional killing from murder to manslaughter.  The jury was not instructed, however, that provocation inadequate to reduce murder to manslaughter may nevertheless raise a reasonable doubt whether the defendant willfully killed with deliberation and premeditation.  (See CALCRIM No. 552; CALJIC No. 8.73)[3]  This point of law is well established.  (See *People v. Avila* (2009) 46 Cal.4th 680, 707; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306; *People v. Rogers* (2006) 39 Cal.4th 826, 877-878; *People v. Cole* (2004) 33 Cal.4th 1158, 1217; *People v. Wickersham* (1982) 32 Cal.3d 307, 329, disapproved on another point in *People v. Barton* (1995) 12 Cal.4th 186, 201; *People v. Valentine* (1946) 28 Cal.2d 121, 132; *People v. Thomas* (1945) 25 Cal.2d 880, 903.)  As Division One of the Court of Appeal for the Fourth Appellate District explained in *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332:  "First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation.

---

[3] CALCRIM No. 522 states:  "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]"  CALJIC No. 8.73 similarly states:  "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

(*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) . . . Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder. (*Ibid.*) To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.) If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder. (*Ibid.*)" (Accord, *People v. Padilla* (2002) 103 Cal.App.4th 675, 678.) The existence, extent and effect of provocation on the defendant's mind in relation to premeditation and deliberation are questions of fact for the jury to resolve. (*People v. Wolfe* (1954) 42 Cal.2d 663, 673; *People v. Thomas, supra,* 25 Cal.2d at pp. 903-904.)

A trial court is not required to instruct a jury on provocation negating willfulness, premeditation and deliberation absent a defense request. (*People v. Rogers, supra,* 39 Cal.4th at p. 877-879; *People v. Mayfield* (1997) 14 Cal.4th 668, 778; *People v. Hernandez, supra,* 183 Cal.App.4th at p. 1333.) Defendant did not request such instruction in this case. Defendant contends, however, Mr. Shapiro was prejudicially ineffective in failing to request the instruction.

Our Supreme Court recently discussed the requisites of an ineffective assistance claim in *People v. Mai* (2013) 57 Cal.4th 986, 1009: "A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) includes the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly

8

difficult to prevail on an *appellate* claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.  (E.g., *People v. Vines* (2011) 51 Cal.4th 830, 875-876 . . . ; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)"

Defendant cannot establish on direct appeal that Mr. Shapiro's performance was deficient.  Mr. Shapiro was not asked to explain why he did not request an instruction on provocation in relation to premeditation and deliberation.  Mr. Shapiro may have made a tactical decision that omitting the instruction was in his client's interest.  Mr. Shapiro may have thought it would be more confusing than helpful.  He may have considered the instructions given adequate to resolve the premeditation and deliberation issue.  He may have been unaware that such instruction was applicable.  Or he may have relied on the trial court to properly instruct the jury and failed to notice the omission.  On the present record, it is impossible to tell.  (*People v. Mendoza Tello, supra,* 15 Cal. 4th at pp. 266-267; *People v. Wickersham, supra,* 32 Cal.3d at p. 334 [failure to sua sponte instruct on second degree murder].)

Even if defendant could establish Mr. Shapiro's performance was deficient, there was no resulting prejudice.  The defense presented evidence defendant was distraught and depressed after Jesse died.  Defendant admitted shooting the three victims.  Defendant said he did not plan to assault them; he fired his weapon only when one of the victims appeared to reach for a gun.  Mr. Shapiro argued to the jury that defendant was unstable in the aftermath of Jesse's murder.  Mr. Shapiro argued defendant did not plan anything, but acted out of intense emotion.

The jury was instructed:  "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  The defendant acted willfully if he intended to kill.  The defendant acted deliberately if he *carefully weighed the considerations for and against his choice and, knowing the*

9

*consequences, decided to kill.* The defendant acted with premeditation if he decided to kill before completing the acts that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. *A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.* On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (Italics added.)

These instructions required the jury to consider defendant's mental state. No doubt, the jury could conclude defendant was distraught, unstable, and overcome with emotion causing him to act rashly and impulsively when he shot the three victims. Under these circumstances, the jury would not have found deliberation and premeditation. The jurors would not have found defendant had carefully considered his choices and knowing the consequences of his actions had decided to kill rival gang members. Instead, they would have concluded he did not act deliberately or with premeditation. But the jury, after considering defendant's mental state as instructed, found he acted willfully, deliberately and with premeditation. Given the evidence, argument and jury instruction in this case, the jury was fully informed it should consider defendant's mental and emotional state. Nothing in the omitted provocation instruction would have further aided the jury in that endeavor. It is not reasonably probable the jury would have found defendant guilty of second instead of first degree murder had the provocation instruction been given. (See *People v. Avila, supra,* 46 Cal.4th at pp. 707-708; *People v. Fitzpatrick, supra,* 2 Cal.App.4th at pp. 1293-1296.)


## B.  Gang Enhancement:  Sufficiency Of The Evidence


Section 186.22, subdivision (b)(1)(C), enhances an accused's sentence by 10 years for a violent felony committed to benefit a criminal street gang. The gang enhancement

10

under section 186.22, subdivision (b)(1), has two elements. First, the underlying crime must be "committed for the benefit of, at the direction of, or in association with" a criminal street gang. Second, the crime must be committed "with the specific intent to promote, further, or assist in any criminal conduct" by gang members. (§ 186.22, subd. (b)(1); *People v. Albillar* (2010) 51 Cal.4th 47, 67; *People v. Mejia* (2012) 211 Cal.App.4th 586, 613.) The jury found the gang enhancement allegations true as to all three of defendant's crimes. Defendant argues there was insufficient evidence to support those findings. Defendant asserts: "[N]o substantial evidence was presented suggesting the shooting at [the park] was motivated by any consideration other than [defendant's] grief over the murder of his brother." We disagree.

Our Supreme Court set forth the applicable standard of review in *People v. Albillar, supra,* 51 Cal.4th at pages 59-60: "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. (*Ibid.*) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' (*Ibid.*)" Moreover, [reversal on the ground of insufficiency of the evidence] is unwarranted unless it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the jury's finding].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

It is true that not every crime committed by a gang member is gang related. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138; *People v. Albillar, supra,* 51 Cal.4th at p. 60.) Mere membership in a gang does not support imposition of the gang enhancement. (*People v. Gardeley* (1996) 14 Cal.4th 605, 623-624; *In re Frank S.*

11

(2006) 141 Cal.App.4th 1192, 1196.)  Rather, as the Court of Appeal for the First Appellate District, Division One, observed in *People v. Martinez* (2004) 116 Cal.App.4th 753, 761, "The crime itself must have some connection with the activities of a gang . . . ." (Accord, *In re Frank S.*, *supra,* 141 Cal.App.4th at p. 1199.)

Opinion testimony concerning gang culture and habits is admissible in support of a gang enhancement allegation and may be relied on by the trier of fact.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048; *People v. Gardeley, supra,* 14 Cal.4th at p. 617.)  A properly qualified witness may testify about the meaning of gang tattoos. (*People v. Ochoa* (2001) 26 Cal.4th 398, 437-438, abrogated on another point as noted in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14; *People v. Hawthorne* (1992) 4 Cal.4th 43, 53.)  In addition, a properly qualified witness may testify in response to hypothetical questions based on the facts of the case whether, in his or her opinion, a crime as described was gang related.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1045; see *People v. Spence* (2012) 212 Cal.App.4th 478, 508-509.)

There was substantial evidence from which the jury could find defendant committed the present crimes for the benefit of his gang.  Defendant was a loyal gang member.  He had multiple gang tattoos on his head as well as other parts of his body.  He believed a rival gang, to which at least two of the victims belonged, was responsible for Jesse's death.  Defendant's gang and the victims' gang were long-time rivals.  On the day after Jesse was killed, defendant got a new tattoo on his face.  The new tattoo signified he was an enemy of the rival gang who wanted to harm or kill members of that gang. Defendant did not go in search of the person who shot Jesse.  Defendant did not go after one of the gunman's fellow gang members from the Hollywood area where Jesse was shot.  Instead, defendant, armed with a loaded weapon, went to a park in South Central Los Angeles.  The park was known to be frequented by members of the rival gang. Defendant walked up to rival gang members, one of whom had conspicuous gang tattoos. He made a statement disrespecting the rival gang, then opened fire on the victims. Detective Bourbois testified that maintaining a gang's respect is critical to a gang's continued existence.  Retaliating for a shooting by a rival gang is one important way to

12

maintain a gang's respect.  Especially when a small gang like defendant's is attacked by a rival, the gang must retaliate or lose respect.  In Detective Bourbois's opinion, the crime, as hypothetically described, was committed to benefit defendant's gang.  This was substantial evidence supporting the jury's gang enhancement findings.  Defendant also argues double jeopardy principles preclude a retrial on the gang enhancements.  Because we find substantial evidence supported the enhancements, there is no potential for a retrial, and we need not consider defendant's double jeopardy argument.

### C.  The Firearm Use Enhancement

Defendant argues imposing a section 12022.53, subdivision (d) firearm use enhancement on a defendant convicted of murder violates California's multiple conviction rule and constitutional double jeopardy principles.  Defendant further urges that recent decisions of the United States Supreme Court suggest double jeopardy principles should be applied in a single unitary trial.  Defendant concedes the California Supreme Court has rejected his position.  (*People v. Sloan* (2007) 42 Cal.4th 110, 115-125; *People v. Izaguirre* (2007) 42 Cal.4th 126, 130-134.)  Defendant asserts, "[B]oth *Sloan* and *Izaguirre* are flawed and clearly misapply . . . United States Supreme Court precedents."  Absent controlling United States Supreme Court authority, we are, of course, bound by the decisions of the California Supreme Court.  (*People v. Letner* (2010) 50 Cal.4th 99, 197-198; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Therefore, we must reject defendant's contentions.

### D.  Sentencing

There are several jurisdictional sentencing modifications that must be made.  First, the trial court imposed a 25-years-to-life sentence under section 12022.53, subdivision (d) for firearm use.  The trial court should also have imposed and then stayed consecutive 10 and 20 year sentences under section 12022.53, subdivisions (b) and (c) respectively.

13

(*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1122-1123, 1130; *People v. Warner* (2008) 166 Cal.App.4th 653, 659.) The judgment must be modified as to all three counts and the abstract of judgment amended to so provide.

Second, the trial court stayed the sentences on two prior separate prison term enhancements found true under section 667.5, subdivision (b). The trial court was required to either impose or strike the enhancements as to each indeterminate count. (*People v. Langston* (2004) 33 Cal.4th 1237, 1241; *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1561-1562.) Upon remittitur issuance, the trial court must either impose or strike the prior separate prison term enhancements.

Third, the trial court purported to stay the gang findings. There is no authority to stay a gang finding under these circumstances. As to count 1, the gang finding created a 50-year minimum parole eligibility date because of defendant's prior attempted second degree robbery conviction. As to counts 2 and 3, the gang finding created a 30-year minimum term as to each count because of defendant's prior attempted second degree robbery conviction. (*People v. Jefferson* (1999) 21 Cal.4th 86, 90; *People v. Mendoza* (2000) 78 Cal.App.4th 918, 929.) No gang enhancement was imposed as to any count because defendant was convicted of a felony punishable by imprisonment for life. Rather, the gang finding created minimum eligibility parole dates. (§ 186.22, subd. (b)(1), (5); *People v. Lopez* (2005) 34 Cal.4th 1002, 1004, 1011.) Thus, the oral pronouncement of judgment is modified to set aside the order staying the gang finding.

Fourth, the trial court orally imposed a single $40 court operations assessment under section 1465.8, subdivision (a)(1). The trial court should have imposed the assessment as to each count for a total of $120. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 484-485; *People v. Schoeb* (2005) 132 Cal.App.4th 861, 865-868; see *People v. Alford* (2007) 42 Cal.4th 749, 758, fn. 6.) The judgment must be modified to so provide. The abstract of judgment is correct in this regard and need not be amended.

Fifth, defendant received credit for 445 days in presentence custody. However, because he was arrested on October 10, 2011, and sentenced on January 8, 2013,

14

defendant was entitled to credit for 457 days in presentence custody. The judgment must be modified and the abstract of judgment amended to so provide.

Sixth, the abstract of judgment must be amended to correctly set forth the terms imposed on all counts. At present, the abstract of judgment incorrectly states defendant received a sentence of 25 years to life on count 1. In fact, defendant received a sentence of 75 years to life after the doubling of the term for first degree murder. As to counts 2 and 3, the abstract of judgment incorrectly states defendant received a sentence of 15 years to life. In fact, defendant received as to both counts 2 and 3 sentences of 55 years to life after the minimum term resulting from the gang finding was doubled. (As noted above, the order staying the gang enhancement must be reversed.) The trial court is to personally ensure the abstract of judgment is amended to properly reflect the judgment, including all of the modifications discussed above. (*People v. Acosta* (2002) 29 Cal.4th 105, 109, fn. 2; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)


## IV. DISPOSITION


The judgment must be modified to: impose and then stay consecutive 10 and 20 year sentences under Penal Code section 12022.53, subdivisions (b) and (c); provide that defendant is subject to a 30-year parole eligibility term pursuant to Penal Code section 186.22, subdivision (b)(5) as to counts 2 and 3 in addition to the firearm use enhancement; impose a $40 court operations assessment under Penal Code section 1465.8, subdivision (a)(1) as to each count; and award defendant credit for 457 days in presentence custody. In all other respects, the judgment is affirmed. Upon remittitur issuance: the trial court must either impose or strike the prior separate prison term enhancements under Penal Code section 667.5, subdivision (b); the abstract of judgment must be corrected to correctly reflect the 75 years to life sentence on count 1 and the 55 years to life sentences on counts 2 and 3; and the superior court clerk must prepare an amended abstract of judgment and deliver a copy to the Department of Corrections and

Rehabilitation. Because of the complexity of the sentences, the trial court is to personally supervise the preparation of the amended abstract of judgment.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P.J.


We concur:


MOSK, J.


KUMAR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16