Filed 8/27/20  P. v. Espinosa-Alvarez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071983 |
| v. | (Super.Ct.No. RIF1506730) |
| RUBEN ESPINOSA-ALVAREZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Stephen J. Gallon, Judge.  Affirmed with directions.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ruben Espinosa-Alvarez admitted killing his wife.  He choked her until she was unconscious, then hit her in the back of the head with a claw hammer.

1

Defendant testified, however, that he was having a hallucination, brought on by marijuana use, that his wife was a "reptilian alien."

In a jury trial, defendant was found guilty of first degree murder (§§ 187, subd. (a), 189, subd. (a))[1] with an enhancement for the personal use of a deadly or dangerous weapon (§ 12022, subd. (b)(1)). He was sentenced to a total of 26 years to life in prison, along with the usual fines, fees, and ancillary orders.

Defendant now contends:

1. The jury instructions erroneously failed to define "provocation" for purposes of reducing the degree of murder.

2. The trial court erred by imposing fines and fees without determining whether defendant had the ability to pay them.

3. The sentencing minute order and the abstract of judgment erroneously reflect the imposition of a booking fee.

The People concede that the record must be corrected with regard to the booking fee. We agree, and we will so direct. Otherwise, we find no error. Accordingly, we will affirm the judgment.

---

[1] These and all further statutory citations are to the Penal Code, unless otherwise specified.

# I

## STATEMENT OF FACT

A.     *Defendant and Esther's Relationship*.

Defendant and his wife Esther married in 2008. Her parents did not like him, at least partly because they were Jehovah's Witnesses, and defendant, who was also a Jehovah's Witness, had been disfellowshipped. This caused tension between Esther and her family.

Esther's sister Marcela described defendant as "[l]ike a Jekyll and Hyde." He could be "very kind, very good, very nice," but he could also get "[v]ery angry." Esther's sister Talitha agreed that "[h]e could be charming and pleasant with whoever he was with, and then just be completely different with [Esther]." He was also "a bit controlling."

Defendant admitted that he cheated on Esther twice during the marriage. After a domestic violence incident in January 2012 (see part I.B, *post*), precipitated by defendant's infidelity, they separated. In or before June 2012, they reconciled. By April 2014, however, they had separated again, again due to defendant's infidelity. At one point, Esther blocked defendant's number. By the end of 2014, however, they were communicating again.

Around the middle of 2015, they started living together again in a converted garage in Moreno Valley. In October 2015, Esther told her sister Talitha, "I honestly don't know why I keep trying. He hasn't changed. He's still doing the same things." In

December 2015, Esther's sister Adriana visited defendant and Esther at their apartment; she could tell there was "casual/serious" tension between them. About three days later, Esther texted Adriana that she "was fed up with all this shit." Adriana believed this referred to defendant, because she knew that he and Esther had been arguing.

B.     *Previous Domestic Violence*.

On the night of January 18-19, 2012, a little before 12:35 a.m., Esther called 911. When police responded, she was outside her apartment.

She told police that she and defendant had gotten into an argument over him wanting a divorce. When she got up to go sleep in the living room, he hit her several times in the face and stomach. She reached for her cell phone to call police, but he grabbed it away from her, then held her down. She could not breathe, so she started hitting him on the back of the head. He then stopped fighting. She went outside and used his cell phone to call police.

When the police arrived, Esther was crying and seemed "very frightened" of defendant. Her shirt was torn. She said her head hurt. She had no visible injuries, though it may have been too soon for any bruises to show.

Defendant was inside the apartment, waiting for the police. He said "he was guilty [of] hitting his wife." He gave them essentially the same account as Esther had. He did claim she hit him first. However, he merely said this made him lose his temper; he did not claim self-defense. He eventually pleaded guilty to misdemeanor battery.

4

C.    *The Discovery of Esther's Body*.

On the night of December 16-17, 2015, around 12:30 a.m., defendant called 911. He gave his name and address and said, "I just killed my wife." "With a hammer. And I choked her to death." "I'm sorry, God. I'm sorry." He also said, "I need the light. It's dark outside." He repeated, "All I need is love" over and over again.

When police responded, defendant ran toward them. They arrested and handcuffed him. He was "very emotional and yelling." He said, "I take full responsibility. I killed her."

Inside the apartment, the police found Esther's body, face down on the floor. She had "a small wound to the back of her head." A claw hammer was on the floor. A little marijuana was "lying around."

Esther was not breathing and had no pulse; her lips were blue. Nevertheless, the police performed CPR; when paramedics arrived, they continued CPR. She was taken to a hospital, where doctors put her on a ventilator and managed to get her heart beating again. She was bleeding from a cut on the back of her head. She had a double skull fracture and bleeding in the brain. By December 19, she was brain dead. At her family's request, she was taken off life support. She died about 15 minutes later.

An autopsy showed that the cause of death was blunt force head trauma. There were "scattered" bruises on her chest, arms, and legs. Strangulation could not be definitely ruled in or ruled out.

D.    *Defendant's Testimony*.

Defendant testified in his own defense, as follows.

In the 2012 incident, he and Esther both "put hands on each other." He waited inside for the police. He took responsibility and did not try to blame Esther. He took 52 weeks of court-ordered domestic violence and anger management classes; he felt that he had learned from them.

As of December 2015, defendant and Esther "were getting along well." She did not say that she was unhappy or that she wanted to leave him.

Around the beginning of December 2015, defendant started watching videos on YouTube by one David Icke. They were about "conspiracies . . . and knowledge . . . that's being suppressed . . . ." According to Icke, "reptilian aliens [were] controlling the earth . . . through a hidden dimension . . . ." Defendant liked the videos because they "gave an explanation for the way things happened in the world." They gave him a sense of "knowing" and "empowerment."

On the night of the crime, defendant and Esther smoked marijuana and watched David Icke videos together. Defendant had been smoking marijuana "[p]retty much every day" for about six months. Suddenly, he had "an out-of-body experience." He felt a sense of awareness, knowledge, understanding, and "[i]nfinite possibilities." He felt "enlightenment" but also "dread." He could see himself "in different lifetimes," "past, present, and future," but always with Esther as his "soulmate."

6

Defendant started saying random words and quotations from movies and from the Bible. Esther got "a little freaked out" and asked, "What's going on?" He kept trying to go "outside to see the light", but she kept stopping him. Around 8:00 or 9:00 p.m., they both went to bed and fell asleep.

Around midnight, defendant woke up and smoked some more marijuana. The same altered state came over him again. He felt the same urge to go outside and see the light.

As defendant went to the door, in the dark, he bumped into what he believed to be a "reptilian alien." It seemed "huge," "very powerful," and "not friendly." It blocked him from going outside. It pushed him, and he hit the wall. "A struggle ensued." Defendant was "terrified." However, he felt that, by quoting books, songs, movies, and the Bible, he was "diminishing the entity's power." Eventually, he managed to pin it to the ground. It was face down, and he was on top of it, on its back. He put one arm around its neck and "squeeze[ed]."

Once the entity stopped moving, defendant got up and turned on the light. He could not tell whether the entity was alive or dead. Seeing a hammer on the floor, he picked it up and hit the entity once, in the back of the head. He felt scared and angry. He denied intending to kill; he did not recall "having any intention." Some 15 to 30 seconds later, he realized that it was Esther on the floor and that he had killed her.

He called 911. During the call, and when the police arrived, he was still in an altered state.

## II

## FAILURE TO DEFINE PROVOCATION

## FOR PURPOSES OF REDUCING THE DEGREE OF MURDER

Defendant contends that the instructions erroneously failed to define provocation for purposes of reducing the degree of murder. They did define provocation for purposes of reducing murder to manslaughter, but in his view, the definition is different for purposes of reducing the degree of murder.

A.      *Additional Factual and Procedural Background*.

The trial court gave CALCRIM No. 521, concerning first degree murder, which stated, in part: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation." "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

It also gave CALCRIM No. 522, concerning provocation in general, as follows:

"Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. . . .

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

Finally, it gave CALCRIM No. 570, specifically concerning provocation for the purpose of reducing murder to manslaughter, as follows:

8

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"Number 1, the defendant was provoked;

"Number 2, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"And three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] . . .

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than judgment."

9

B.    *Discussion*.

In the law of homicide, provocation plays two different roles.

First, it may reduce what might otherwise be murder to manslaughter.  "A person who kills without malice does not commit murder.  Heat of passion . . . precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. . . . Heat of passion . . . is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation."  (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)  When used for this purpose, the provocation must meet an objective test:  "The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment."  (*People v. Lee* (1999) 20 Cal.4th 47, 60.)

Second, provocation may reduce what might otherwise be first degree murder to second degree murder.  Subject to exceptions not applicable here, first degree murder requires premeditation and deliberation.  (§ 189; *People v. Delgado* (2017) 2 Cal.5th 544, 571.)  "[T]he '"existence of provocation . . . may . . . raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation"' . . . .  [Citation.]"  (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

Unlike provocation that is used to reduce murder to manslaughter, provocation that is used to reduce the degree of murder does not have to meet an objective test.  (*People v. Carasi*, *supra*, 44 Cal.4th at p. 1306; see also *People v. Padilla* (2002) 103 Cal.App.4th 675, 678; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295.)

10

"'When a word or phrase "'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.'" [Citations.]' [Citation.] It is only when a word or phrase has a 'technical, legal meaning' that differs from its 'nonlegal meaning' that the trial court has a duty to clarify it for the jury. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 670.)

In defendant's view, the word provocation, in the context of reducing the degree of murder, has a technical meaning peculiar to the law. He therefore argues that the trial court erred by failing to provide this definition.

We disagree. The ordinary meaning of provocation is "[t]he action of provoking or exciting anger, resentment, or irritation, esp. deliberately; action, speech, etc., that provokes strong emotion; an instance of this." (Oxford Engl. Dict. Online (2020) <http://oed.com>, def. 2.a, as of Aug. 26, 2020.) That is exactly what it means as used in CALCRIM No. 522. Anger, resentment, irritation, and strong emotion are inherently subjective. No one would understand provocation as used in CALCRIM No. 522 to be setting up an objective standard.

Indeed, that is precisely why CALCRIM No. 570 goes on to explain that, when provocation is used to reduce murder to manslaughter, it must meet certain additional criteria. One of these is an objective test — "the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

11

Defendant also argues that, because the jury was given both CALCRIM No. 522 and CALCRIM No. 570, it was likely to conclude that an objective test applies to provocation for both purposes. *People v. Jones* (2014) 223 Cal.App.4th 995 rejected this very argument, for two alternative reasons:

"The first is that the instructions are correct. They accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed. CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' [Citation.] As the jury also was instructed, a reduction of murder to voluntary manslaughter requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment.

"There was no error in giving these instructions.

"Which takes us to the second reason to reject the argument. What appellant is arguing is that a more specific instruction, actually a pinpoint instruction, should have been given informing the jury that the objective test did not apply to reduction of the degree of murder. [Citation.] Defense counsel did not request such an instruction, and his failure to do so forfeits the claim on appeal. [Citation.]" (*People v. Jones*, *supra*, 223 Cal.App.4th at p. 1001.)

12

Defendant claims *Jones* is distinguishable. He asserts that it did not reach the first part of his argument — i.e., that the trial court had a duty to define provocation for purposes of reducing the degree of murder, because it has a technical meaning peculiar to the law. Admittedly, *Jones* did not reach that part of his argument, but we have already disposed of it above. *Jones* did dispose of the second part of his argument — i.e., that giving CALCRIM NO. 522 with CALCRIM No. 570, without further elaboration, was likely to confuse the jury. The additional definition of provocation that defendant claims the trial court should have given is precisely the kind of pinpoint instruction that *Jones* held was not required.

Defendant also disagrees with *Jones.* He says that "CALCRIM No. 570 defines provocation" and thus could lead the jury to apply the same definition for purposes of reducing the degree of murder. Actually, *neither* CALCRIM No. 522 nor CALCRIM No. 570 *defines* provocation. They *both* use it in its common or garden sense. CALCRIM No. 570 goes on to state, however, that for provocation to reduce murder to manslaughter, it must meet certain *additional* tests, including the objective test. We agree with *Jones* that reasonable jurors would not export these additional tests back into CALCRIM No. 522 for purposes of reducing the degree of murder.

Finally, defendant argues that his counsel rendered ineffective assistance by failing to request a pinpoint instruction that, for purposes of reducing the degree of the murder, provocation is measured by a subjective standard.

13

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'  [Citation.]  To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.'  [Citation.]"  (*People v. Hoyt* (2020) 8 Cal.5th 892, 958, pet. for cert. filed May 12, 2020.)

Defense counsel's failure to request a pinpoint instruction was not objectively unreasonable.  The trial court can refuse to give a pinpoint instruction when it ""'"merely duplicates other instructions [citation] . . . ."'""  (*People v. Williams* (2016) 1 Cal.5th 1166, 1193.)  As already discussed, *Jones* had held that the standard CALCRIM instructions already correctly state the law on provocation for the purpose of reducing the degree of murder.  Reasonable defense counsel could rely on *Jones*.

Moreover, the jury was fully instructed on voluntary intoxication (CALCRIM No. 625) and hallucination (CALCRIM No. 627).  Defendant now claims that voluntary intoxication and hallucination "were the equivalent of subjective provocation . . . ."  In

14

other words, his subjective perception that Esther was a reptilian alien that pushed him and blocked his way out constituted provocation. Even if so, defense counsel could reasonably choose to focus on these theories rather than risk confusing the jury by making essentially the same argument under the rubric of provocation.

For the same reasons, the asserted ineffective assistance was not prejudicial. The trial court would have been free to refuse to give the pinpoint instruction. And even if the trial court had given it, the jury rejected defendant's argument that he did not premeditate and deliberate as a result of either voluntary intoxication or hallucination. There is no reason to suppose it would have come to a different verdict if the identical argument had been framed in terms of provocation.

## III

## FAILURE TO DETERMINE ABILITY TO PAY

Defendant contends that the trial court erred by imposing fines and fees without determining whether he had the ability to pay them.

A.    *Additional Factual and Procedural Background*.

At sentencing, in 2018, the trial court declined to impose a booking fee. (Gov. Code § 29550.2.) However, it did impose a $7,800 restitution fine (§ 1202.4), a $7,800 parole revocation fine (stayed) (§ 1202.45), a $40 court operations assessment (§ 1465.8,

15

subd. (a)(1)), and a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)).[2] Defense counsel did not object.

      B.     *Discussion*.

Defendant relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, which held that due process prohibits the imposition of a criminal fine or fee in the absence of a hearing on the defendant's ability to pay. (*Id*. at pp. 1160, 1164-1172.)

Preliminarily, the People contend that defense counsel forfeited this contention by failing to raise it below.

In *People v. Jones* (2019) 36 Cal.App.5th 1028, we held that, when a defendant was sentenced before *Dueñas* was decided, failure to object does not result in forfeiture, because an objection would have been futile. (*Jones*, *supra*, at pp. 1031-1034.) It is significant, however, that in *Jones*, the trial court imposed the minimum restitution fine — $300. (*Id*. at p. 1030; cf. § 1202.4, subd. (b)(1).)

Thereafter, in *People v. Taylor* (2019) 43 Cal.App.5th 390, we held that if the trial court imposes *more* than the minimum restitution fine, failure to object *does* result in forfeiture specifically with respect to the restitution fine, even when the defendant was sentenced before *Dueñas*. (*Taylor*, *supra*, at pp. 399-401.) We explained that an objection would not have been futile because, even before *Dueñas*, the trial court could

---

    **2**      The trial court also imposed $1,095 in presentence report costs. (§ 1203.1b, subd. (a).) Defendant does not challenge this fee.

consider inability to pay in deciding whether to impose a restitution fine in excess of the minimum. (*Taylor*, *supra*, at p. 399; see § 1202.4, subd. (c).)

Here, then, defense counsel forfeited any objection to the amount of the restitution fines, but not to the amount of the other fees. "As to those fees, the substantive law in existence at the time of his sentencing 'would have meaningfully foreclosed the argument he now seeks to advance.' [Citation.]" (*People v. Taylor*, *supra*, 43 Cal.App.5th at p. 401.)

Defendant nevertheless argues that there was no forfeiture at all, for three reasons.

First, he argues that a trial court's complete failure to exercise discretion can be raised for the first time on appeal. (See *In re Sean W.* (2005) 127 Cal.App.4th 1177, 1181-1182.) With regard to the restitution fines, the trial court clearly did exercise discretion; it set these above the minimum of $300 and below the maximum of $10,000. (See § 1202.4, subd (b)(1).) The other fees were mandatory, in the absence of an objection. Thus, the trial court was never called upon to exercise discretion and did not err by not doing so.

Second, he argues that the asserted error comes under the unauthorized sentence exception to the general rule of forfeiture. In *People v. Avila* (2009) 46 Cal.4th 680, the Supreme Court rejected an identical contention: "Defendant contends, however, that because he did not have the ability to pay, the . . . fine was an unauthorized sentence, thus exempting him from having to bring his claim to the court's attention. [Citation.] Not so. Had defendant brought his argument to the court's attention, it could have exercised

17

its discretion and considered defendant's ability to pay . . . in ascertaining the fine amount[s]." (*Id*. at p. 729.)

Third, quoting *People v. Vera* (1997) 15 Cal.4th 269, disapproved on other grounds in *People v. French* (2008) 43 Cal.4th 36, 47, footnote 3, defendant argues that he is entitled to raise a claim of a "'deprivation of certain fundamental, constitutional rights'" for the first time on appeal. (*Id*. at p. 276.) "But none of the narrow class of such rights — a plea of once in jeopardy and the right to jury trial [citation] — is implicated here. . . . [T]hat dictum in *Vera* was not intended to provide defendants with an 'end run' around the forfeiture rule, thus eviscerating it." (*People v. Tully* (2012) 54 Cal.4th 952, 980, fn. 9.)

Finally, defendant contends that any forfeiture by his counsel constituted ineffective assistance of counsel. On this record, however, we cannot say there could be no satisfactory reason for defense counsel's failure to object. (See *People v. Keene* (2019) 43 Cal.App.5th 861, 864-865.) For example, for all we know, defendant did have the ability to pay, and defense counsel knew it. Indeed, defense counsel could have reasoned that raising the issue might cause the trial court to change its ruling that defendant need not pay booking fees. Defendant claims he is indigent, noting that he has appointed counsel. However, he refused to talk to the probation officer about his employment and income, and there is no evidence of his assets. On this record, we cannot conclude as a matter of law that he could not pay the $7,800 restitution fine.

We therefore consider only the $40 court operations assessment and the $30 court facilities assessment.

Preliminarily, we question whether *Dueñas* is good law. In *Jones*, we did not consider this issue, because the People did not argue that *Dueñas* was wrongly decided. (*Jones*, *supra*, 36 Cal.App.5th at p. 1030.) This issue is currently pending before our Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) We will assume, without deciding, that we should follow *Dueñas*.

In *Jones*, however, we also held that a *Dueñas* error may be held harmless if the record demonstrates that the defendant could not have shown inability to pay. (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035.) In that case, it was clear that the defendant could pay the fines out of his prison wages; therefore, the error was harmless. (*Ibid*.)

The same is true here. As *Jones* noted, a prisoner can earn a minimum of $6 a month, net after certain deductions. (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035; see also Cal. Dept. of Corrections and Rehabilitation, Operations Manual, ch. 5, art. 12, § 51120.6, p. 347 (Jan. 1, 2020) https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2020/03/2020-DOM-02.27.20.pdf, as of Aug. 26, 2020.) The fees imposed here totaled only $70. As defendant has been sentenced to 26 years to life in prison, we are satisfied that he has the ability to pay.

IV

CLERICAL ERROR REGARDING THE BOOKING FEE

Defendant contends that the clerk's transcript erroneously reflects the imposition of a booking fee. The People concede the point. We agree.

The probation report recommended the imposition of a booking fee of $514.58. According to the reporter's transcript, at sentencing, the trial court said, "I'm not going to impose booking fees." According to the minute order and the abstract of judgment, however, it imposed a booking fee of $514.58.

"In a criminal case, judgment is rendered when the trial court orally pronounces sentence. [Citations.]" (*People v. Karaman* (1992) 4 Cal.4th 335, 344, fn. 9.) "Any discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error. [Citation.]" (*People v. Leon* (2020) 8 Cal.5th 831, 855.) "Courts may correct clerical errors at any time . . . ." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

We will therefore correct the error in our disposition.

V

DISPOSITION

The judgment is affirmed. The superior court clerk is directed to prepare an amended sentencing minute order and an amended abstract of judgment, showing that no booking fee was imposed (see part IV, *ante*), and to forward a certified copy of the

20

amended abstract to the Director of the Department of Corrections and Rehabilitation. (§§ 1213, 1216.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

FIELDS
J.

21