Filed 12/27/22  P. v. McCoy CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LIONEL JERICHO MCCOY, JR.,<br><br>        Defendant and Appellant. | A157103<br><br>(San Mateo County<br>Super. Ct. No. 16-SF-010449) |

Defendant Lionel Jericho McCoy, Jr., appeals a judgment convicting him of, among other things, first degree murder and sentencing him to 50 years to life in prison. He contends his convictions must be reversed because the jury was not properly instructed. Alternatively, he argues that his murder conviction must be reduced to second degree murder because he was not given notice that he was being charged with first degree murder, and that the matter must be remanded for resentencing because the court failed to consider his ability to pay before imposing victim restitution and various fees and fines. Finally, defendant requests this court to independently review the in camera hearing on his *Pitchess*[1] motion to determine whether the trial court correctly denied the release of any requested documents. We find no instructional error and conclude that the information sufficiently advised

_____

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

1

defendant of the first degree murder charge. We also find no error with respect to the trial court's consideration of defendant's *Pitchess* motion. The record, however, is unclear as to the amount of victim restitution awarded by the court and the amount of the restitution fine imposed. Accordingly, we shall remand for clarification in that regard and affirm the judgment in all other respects.

## BACKGROUND

Defendant was charged with the murder of Christopher Puckett (Pen. Code,[2] § 187, subd. (a)) and being a felon in possession of a firearm (§ 29800, subd. (a)(1)). The information also alleged several sentence enhancements including that defendant personally discharged a firearm in the commission of the murder (§ 12022.53, subds. (b), (c), (d)), defendant inflicted great bodily injury (§ 1203.075, subd. (a)), defendant had suffered two or more strike convictions (§ 1170.12, subd. (c)(2)) and several prior felony convictions (§ 667.5, subd. (b)), the charged offense is a serious or violent felony (§ 1203.085, subd. (b)), defendant was on parole at the time of the offense (§ 1203.085, subd. (a)) and on probation at the time of the offense (§ 12022.1).

At trial, there was testimony that on the night of the shooting, June 10, 2016, Puckett's girlfriend told the police that two weeks earlier Puckett had been in a physical altercation with "Fred and L." Two witnesses, a couple, testified that on the evening of June 10, 2016, they saw defendant, or "L" as they knew him, shoot and kill Puckett. The witnesses knew defendant from other interactions in the neighborhood and were able to identify him as the shooter from a photographic lineup. The witnesses acknowledged that they identified defendant as the shooter after they had been arrested on various other criminal charges. Those charges were dropped and they were receiving

---

[2] All statutory references are to the Penal Code unless otherwise noted.

relocation payments in exchange for their truthful testimony. The prosecution argued that the murder was likely committed over a drug turf dispute.[3]

Defendant testified at trial. He admitted he often sold drugs in the area where the shooting occurred and was in the area that night, but he denied shooting the victim. He acknowledged that he knew the two eyewitnesses from around the neighborhood and had heard of the victim but claimed that he did not know the victim personally. In closing argument, defense counsel challenged the adequacy of the police investigation and suggested the investigators improperly focused their investigation solely on defendant. He suggested the eyewitnesses were influenced by that investigation and motivated to testify for personal gain.

The jury convicted defendant on both counts and found the enhancements true. Defendant was sentenced to 25 years to life on the murder count with a consecutive 25-year-to-life term for the personal-use-of-a-firearm enhancement. The felon in possession conviction was sentenced concurrently and the remaining enhancements were stayed. Defendant timely filed a notice of appeal.

## DISCUSSION

1. *The jury was properly instructed.*

A. Instructions Regarding Eyewitness Reliability

As set forth above, defendant's guilt was based largely on the testimony of the two eyewitnesses who identified defendant as the shooter. The jury was

---

[3] Evidence was introduced that Puckett was killed by shots fired from a .40-caliber Glock pistol. The prosecution also introduced, over defendant's objection, several rap songs and videos recorded near the time of the shooting, in which defendant references, among other things, owning a .40-caliber Glock pistol. Defendant does not challenge that ruling on appeal.

instructed, pursuant to CALCRIM No. 315, that the witness's level of certainty was one of 15 factors the jury should consider when evaluating eyewitness identification testimony.[4] Defendant contends that empirical research shows that confidence in an identification is generally not a reliable indicator of accuracy so that the instruction as given violated his right to due process.

In *People v. Lemcke* (2021) 11 Cal.5th 644, 659–661, the court rejected the argument that instructing the jury to consider an eyewitness's level of certainty, without clarifying the limited correlation between certainty and accuracy, violated due process. The court relied on its long-standing authority holding that CALCRIM No. 315 is "superficially neutral." (*Id.* at p. 657.) The court explained, "the instruction does not direct the jury that 'certainty

---

[4] CALCRIM No. 315, as given, read as follows: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] Did the Witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and the defendant of different races? [¶] Was the witness able to identify other participants in the crime? [¶] Was the witness able to identify the defendant in a photographic or physical lineup? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification?"

4

equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Ibid*.)

Nonetheless, the court acknowledged that "this form of instruction has the potential to mislead jurors" and that "[t]here is near unanimity in the empirical research that ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' " (*People v. Lemcke, supra,* 11 Cal.5th at p. 665.) Accordingly, joining other jurisdictions that have sought to improve the accuracy of the instruction, the court exercised its supervisory authority to direct "trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion." (*Id.* at p. 669.)

Defendant argues that the decision in *Lemcke* establishes prejudicial error in this case. We disagree. Insofar as the court expressly rejected his argument that the instruction, as given, violated his due process rights, we are bound by that decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Defendant's attempt to limit the Supreme Court's holding to trials at which the defense calls an expert witness on eyewitness identification is not persuasive. While the court noted that defendant was "permitted" to present expert witness testimony to rebut any inference that

5

certainty is generally correlative of accuracy, the holding does not depend on the admission of such testimony. (*People v. Lemcke, supra,* 11 Cal.5th at pp. 657–660, see also *People v. Wright* (2021) 12 Cal.5th 419, 453 (*Wright*) [CALCRIM No. 315 did not violate due process where no defense expert testimony re eyewitness identification].)

Moreover, any possible confusion by the jury regarding the lack of correlation *generally* between certainty and accuracy was not prejudicial for the same reason that potential was not prejudicial in *Wright, supra,* 12 Cal.5th 419. In that case, the court reasoned, "Although the defense below did not present an eyewitness identification expert as had occurred in *Lemcke*, defendant's primary trial strategy was to discredit [the three eyewitnesses], and to imply that the eyewitnesses were testifying falsely. At no point did defendant argue that the witnesses mistook his identity. This was in contrast to *Lemcke*, where the defense strategy focused on questioning the victim's identification of the defendant. [Citation.] The instant case involved the identification of defendant by multiple witnesses, and, unlike in *Lemcke*, at least two of the witnesses had known defendant in some capacity prior to the attack. [¶] Further, here the trial court's instructions as a whole properly instructed the jury how to evaluate the evidence presented. The court also instructed the jury . . . concerning the believability of a witness and . . . concerning a witness who is willfully false. When considered ' "in the context of the instructions as a whole and the trial record" ' [citation], the trial court's use of CALJIC No. 2.92[5] did not violate defendant's due process rights." (*Wright, supra,* at p. 453.)

---

[5] CALCRIM No. 315 and CALJIC No. 2.92 are similarly worded and contain no material distinctions. (*Wright, supra*, 12 Cal.5th at p. 453.)

As in *Wright*, in this case the accuracy of the eyewitnesses' identifications was not questioned by the defense and the certainty of their identifications was not emphasized by the prosecution. Both witnesses testified that they knew defendant before the shooting and defendant admitted he had seen both witnesses around the neighborhood. Both witnesses were also questioned extensively regarding any personal benefit they received for testifying. The significant question at trial was not the accuracy or certainty of their identification but the credibility of the identification. In closing argument, defense counsel suggested that the eyewitnesses did not identify defendant as the shooter until after the police department floated a rumor that defendant was involved, and argued that given the physical evidence, neither could have seen what they said they saw. The jury was instructed with CALCRIM No. 226 regarding factors to consider in determining the "credibility or believability" of a witness, including whether the witness was promised leniency in exchange for his or her testimony, and how to evaluate testimony by a witness who is willfully false. In light of all of the instructions given, any failure to clarify the role of certainty in eyewitness identifications did not violate defendant's right to due process.

B. Instructions as to Lost or Destroyed Evidence

At trial, the People introduced evidence suggesting that defendant switched the SIM card in his cell phone after the shooting. The jury was instructed, pursuant to CALCRIM No. 371, "If the defendant tried to hide evidence against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

7

Defendant presented testimony regarding evidence lost or destroyed by the police. With regard to this evidence, the jury was instructed, "The jury has heard evidence that on the night of the alleged murder, a video surveillance camera recorded three silhouettes leaving the scene of the murder and a car also shortly thereafter leaving the scene. Officer Weigand of the East Palo Alto Police Department recorded the video on his police issued cellphone and recorded it on to a disc. [¶] The chief investigating officer at the time, Detective Ong[,] took possession of the disc, never logged it into evidence and then lost it. The jury can consider these facts in determining the nature of the East Palo Alto Police Department's investigation in this case and ultimately in determining the guilt or innocence of the defendant."[6]

Relying on *Cool v. United States* (1972) 409 U.S. 100 (*Cool*), defendant contends the trial court's disparate instructions on lost or destroyed evidence violated his "right to balanced instructions." (*People v. Peterson* (2020) 10 Cal.5th 409, 455.) In *Cool,* an alleged accomplice of the defendant gave exculpatory testimony. (409 U.S. at p. 103, fn. 4.) Despite the exculpatory character of the evidence, the court instructed the jury that it could rely on the evidence to convict, but failed to mention that the jury could also rely on the evidence to acquit: " ' "I further instruct you that testimony of an accomplice may alone and uncorroborated support your verdict of guilty of the charges in the Indictment if believed by you to prove beyond a reasonable doubt the essential elements of the charges in the Indictment against the defendants." ' " (*Ibid*.) The Supreme Court concluded this instruction required

---

[6] At trial, the prosecution reported that Ong was no longer an officer with the East Palo Alto Police Department and that he would not be called as a witness at trial.

reversal: " '[E]ven if it is assumed that [the alleged accomplice's] testimony was to some extent inculpatory, the instruction was still fundamentally unfair in that it told the jury that it could convict solely on the basis of accomplice testimony without telling it that it could acquit on this basis.' " (*Ibid*.)

Defendant argues, "Just as in *Cool*, the trial court singled out a certain type of evidence and gave jurors unbalanced instructions on that evidence. There were numerous ways the court could have given balanced instructions. It could have instructed jurors that if they found Mr. McCoy had lost or hidden evidence, they could consider that evidence in assessing his guilt or innocence. Or the court could have instructed jurors that if they found the state lost or destroyed evidence, they could infer the state was aware Mr. McCoy was innocent. Either set of instructions would have represented a balanced approach to the issue of lost or destroyed evidence."

Defendant's reliance on *Cool* is misplaced. In *Cool,* the jury was told that the same testimony could be given greater weight if it favored the prosecution than if it favored the defense. Here, two distinct and unrelated pieces of evidence were missing or destroyed under different circumstances and the court gave instructions appropriate to each of the different circumstances. On one hand, the evidence that defendant switched the SIM card on his phone may reflect the concealment of incriminating evidence, and it is well-established that an instruction on consciousness of guilt may properly be given where there is evidence that a defendant destroyed or hid evidence. (See *People v. Cooper* (1991) 53 Cal.3d 771, 833 [disposal of shoes in lake shows consciousness of guilt]; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1296 [defendant's attempt to dispose of gun shows consciousness of guilt].) On the other hand, the normal inference to be drawn from loss of

9

evidence by the police is that the investigation was inadequate.[7] Evidence of such is not subject to the same type of inference. The instruction given the jury properly instructed the jury how such evidence may be considered. The situations being different, there was no imbalance or instructional error.

 2. *Defendant was given notice of the first degree murder charge.*

  The information filed in this case alleged that defendant "unlawfully, and with malice aforethought" committed murder in violation of section 187, subdivision (a). The information did not include an allegation that the murder was premeditated or that defendant was being charged with first degree murder under section 189. Defendant contends due process requires reduction of his murder conviction from first to second degree for lack of notice because the charging instrument did not specify a degree. Defendant concedes that California courts have consistently rejected this argument. (See, e.g., *People v. Johnson* (2015) 61 Cal.4th 734, 774–775; *People v. Hawthorne* (2009) 46 Cal.4th 67, 89, abrogated on other grounds as stated in *People v. McKinnon* (2011) 52 Cal.4th 610, 637; *People v. Morgan* (2007) 42

---

 [7] While defendant contends the jury could have concluded on the record before us that Ong "tried to suppress" the surveillance video, no such evidence or argument was presented at trial. Rather, the officer who recorded the video testified that he transferred the video from his phone to a CD and gave the CD to Detective Ong. It was only as they were preparing for trial that he learned the CD had not been booked into evidence. He and other officers searched for the CD and the original department phone but were unable to locate either. He explained that Ong had been shot approximately a year before trial and had not returned to the department after being released from the hospital. In closing, defense counsel argued, "[Ong] looks at it. Oh, I can't see anything here. There's silhouettes here. And he loses it. Or somebody lost it. We don't know what happened to it. What he did with it." Defendant has not suggested that there is any evidence that Ong intentionally destroyed the recording.

Cal.4th 593, 616; *People v. Hughes* (2002) 27 Cal.4th 287, 369; *People v. De La Cour Soto* (1883) 63 Cal. 165.)

In *People v. Contreras* (2013) 58 Cal.4th 123, 147 (*Contreras*), the California Supreme Court explained, "As defendant recognizes, our cases have long made clear that an accusatory pleading charging malice murder supports conviction of first degree murder on a felony-murder theory. Malice murder and felony murder are two forms of the single statutory offense of murder. Thus, a charge of murder not specifying the degree is sufficient to charge murder in any degree. The information also need not specify the theory of murder on which the prosecution relies at trial." Similarly, here, defendant was charged in the information with committing willful and unlawful murder within the meaning of section 187, subdivision (a). Although the People did not additionally include language that it was committed with premeditation and deliberation, the pleading of a violation of section 187, subdivision (a), alerted defendant that he could be convicted of first degree murder.

Despite the above case law, defendant contends the United States Supreme Court's decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) requires that the People charge premeditation and deliberation in the information. In *Contreras, supra,* 58 Cal.4th at pages 148–149, our Supreme Court rejected the argument that the longstanding principles and authorities cited above have been abrogated by *Apprendi*. The *Contreras* court observed that "the *Apprendi* court expressly declined to address the constitutional implications, if any, of omitting sentencing factors from accusatory pleadings" (*Contreras,* at p. 148) and reasoned that "[i]n light of the high court's 'narrow' holding [citation], which focuses on facts that must be proved to, and found by, a jury, '[i]t is highly doubtful that *Apprendi* has

11

any effect whatever on pleading requirements' [citation]. In other words, *Apprendi*'s requirements for how element-like sentencing factors must be proved and found create no 'new notice requirements for alternative theories of a substantive offense such as a theory of first degree murder.' " (*Contreras*, at p. 149.) Thus, the court concluded that "this court does not violate *Apprendi* by continuing to apply the traditional California rule that a murder charge under section 187 places the defense on notice of, and allows trial and conviction on, all degrees and theories of murder, including first degree felony murder under section 189." (*Contreras*, at p. 149; see also *People v. Covarrubias* (2016) 1 Cal.5th 838, 923–924 [confirming holding in *Contreras*].) *Contreras* resolves the issue raised by defendant and we are bound to follow that decision. (*Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.)[8]

3. *The matter must be remanded for clarification regarding the amount of victim restitution and the fees and fines imposed.*

At defendant's sentencing hearing, the court ordered defendant to pay $7,224.07 in victim restitution, as well as a "court security fee of $40" and a criminal assessment of $30." The court also ordered defendant to pay "a 5,000-dollar restitution fine with ten percent collection fee. 5,000-dollar fine stayed pending the successful completion of parole." The abstract of judgment filed April 10, 2019, includes a $5,000 restitution fine under section 1202.4, subdivision (b), and a $5,000 suspended parole revocation restitution fine under section 1202.45, but does not include a court security fee under section 1465.8 or a criminal conviction assessment under Government Code section 70373. The abstract also shows the amount of victim restitution as

---

[8] In light of this conclusion we need not address the Attorney General's contention that defendant waived this argument by failing to object in the trial court.

$7,274 rather than $7,224.07. A second abstract of judgment filed April 17, 2019, includes the court security fee and the criminal conviction assessment, but lists only a $300 restitution fine under section 1202.4, subdivision (b) and a $300 suspended parole revocation restitution fine under section 1202.45. It continues to award victim restitution in the amount of $7,274.

On appeal, the parties disagree as to the amount of victim restitution awarded by the court. Defendant contends the oral pronouncement controls, while the Attorney General suggests that the abstracts contain the correct amount, which is consistent with the request by the Victim Compensation Board for $7,274.07 in restitution. The parties also disagree about the amount of the restitution fine imposed by the court under section 1202.4, subdivision (b). Defendant suggests the court imposed a single $5,000 restitution fine which it then stayed pending successful completion of parole. He argues that the $300 restitution fine included in the second abstract must be stricken because "the trial court never imposed an additional restitution fine under section 1202.4, subdivision (b)." The Attorney General acknowledges that the court's imposition of the restitution fine was "somewhat ambiguous." The Attorney General suggests the April 10 abstract correctly included both a $5,000 restitution fine under section 1202.4, subdivision (b), and a $5,000 suspended parole revocation restitution fine under section 1202.45. The Attorney General agrees the $300 restitution fine must be stricken because it is duplicative of the $5,000 fine imposed by the court.

While it appears likely that the court simply misspoke in awarding victim restitution, we will remand with directions to correct the record. On remand, any confusion regarding the amount of the restitution fine imposed under section 1202.4, subdivision (b) may also be resolved. In light of the

13

remand, we need not reach defendant's argument that the victim restitution award, court security fee and criminal conviction assessment must be reversed because the court failed to consider defendant's ability to pay. On remand, defendant "may request a hearing and present evidence demonstrating his inability to pay the fines, fees and assessments imposed by the trial court." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 491.)

4. *The trial court properly considered defendant's Pitchess motion.*

Prior to trial, defendant filed a *Pitchess* motion seeking information from the police personnel files of Detective Ong. The court agreed to review records of Detective Ong regarding fabrication or destruction of evidence and witness tampering. Subsequently the trial court reviewed in camera the personnel records of Detective Ong and found no relevant records for disclosure. The court ordered the records and the transcript of the hearing sealed. On appeal, defendant has requested this court to review the sealed transcript of the in camera hearing. Having done so, we find that the trial court properly questioned the custodian of Detective Ong's records and did not abuse its discretion in determining there were no records improperly withheld.

## DISPOSITION

The matter is remanded for clarification regarding the amount of victim restitution and the fees and fines imposed by the court. The judgment is affirmed in all other respects.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
BROWN, J.

14