Filed 3/24/26  P. v. Delgado CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B340426 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA487278) |
| v. | |
| VERONICA DELGADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Veronica Delgado appeals from a judgment after a jury convicted her of the first degree murder of Oscar Estrada and possession of a firearm by a felon. The prosecution's evidence indicated that Delgado planned and executed a fatal shooting of Estrada at his home in retaliation for his having committed domestic violence against Delgado's daughter (most recently three days before the shooting) and having hit Delgado herself (at least one month before). On appeal, Delgado contends that the trial court prejudicially erred by (1) denying her request to instruct the jury on the heat of passion theory of voluntary manslaughter; (2) failing to instruct the jury, on the court's own motion, regarding how provocation may reduce murder from first to second degree by precluding premeditation and deliberation; and (3) admitting a video, taken by Delgado hours before the murder, of Delgado receiving a neck tattoo from a prosecution witness who testified about Delgado's conduct before, during, and after the shooting. Finding no error, we affirm.

## BACKGROUND

The Los Angeles County District Attorney charged Delgado by information with Estrada's murder (count 1; Pen. Code, § 187, subd. (a))[1] and possession of a firearm by a felon (count 3; § 29800, subd. (a)(1)), and alleged that she personally and intentionally discharged a firearm, causing death (§ 12022.53, subd. (d)). Codefendant Arturo Leon Nava was also charged with Estrada's murder (count 1). Codefendant Celia Villareal was charged with being an accessory after the fact (count 4; § 32).

The charges against all three defendants proceeded to a joint trial before two juries (one jury for Delgado and another for

[1] Undesignated statutory references are to the Penal Code.

her codefendants). Below, we summarize the proceedings before Delgado's jury.

## A. Trial evidence

The prosecution presented the evidence summarized below. Delgado and her codefendants waived their right to testify and did not call any witness.

### 1. Three days before Estrada was fatally shot, he assaulted Villareal. Delgado dissuaded Villareal from giving Estrada's name to the police and told her it would be taken care of.

Before Estrada was fatally shot on the early morning of April 17, 2020, he was in a relationship with Villareal (Delgado's daughter and codefendant). The couple had a child one month before the shooting.

On April 14, 2020 (three days before the shooting), a Monterey Park Police Department officer responded to a report of a fight at a motel, where he spoke with Villareal and Delgado. Villareal had a "fat lip" and a laceration (which was bleeding) to her upper left arm. She reported that she argued with the father of her child—i.e., Estrada, whom she falsely identified as Joshua Hernandez—and that he threw a brick through the driver's-side window of her car when she was sitting in the driver's seat, before he took her car keys and left.

About one day later, Villareal sent the following Facebook message to an unidentified recipient: "I know he did. I wanted him arrested last night and I was so close if hugging [*sic*] up his

name and I wouldn't care of what everyone was gonna say or do but my mom [Delgado] said no that it's gonna get taken care of."[2]

### 2. Hours before the shooting, Delgado received a tattoo from Juan Flores while socializing at a motel with him, Nava, and "Termite."

Juan Flores testified that he (nicknamed "Shady"), Delgado ("Spooky"), codefendant Nava ("Lucky"), and victim Estrada ("Guilty") belonged to the same "group." The trial court excluded proffered evidence that the group was a gang.

Tattooing is Flores's "side hustle."[3] On the evening of April 16, 2020 (hours before the shooting in the early morning of April 17), Flores met Delgado, Nava, and other members of their group, including "Termite," in a motel room, where Flores planned to give Delgado a neck tattoo.[4]

Before the tattooing began, the group socialized and drank beer. In the restroom, Nava showed Flores a gun wrapped in a burgundy bandana. Flores and Nava left the gun there. Flores

---

[2] Estrada's mother testified that around two days before the shooting, Villareal texted her about a domestic violence incident. She did not otherwise remember whether Estrada had a history of domestic violence against Villareal.

[3] A "side hustle" is a "part-time job or occupation undertaken in addition to one's main job in order to earn extra income." (Oxford English Dict. (3d ed.) <https://www.oed.com/dictionary/side-hustle_n?tl=true> [as of Mar. 17, 2026].)

[4] In a photograph of Delgado taken at the time of her arrest, tattoos were visible on the front of her neck, above her right eyebrow, and on her right cheek.

4

did not see the gun again until (as discussed below) he saw Delgado holding it immediately before he heard the shooting.

Flores, Delgado, Nava, and Termite separated from the rest of the group and entered a second motel room. While Flores readied his tattooing equipment, they were drinking beer and "just having a good time."

A video of Flores tattooing Delgado's neck, which Delgado recorded with her phone, was played for the jury (without audio). Flores confirmed that the video showed the four individuals in the second motel room "cutting up" and "having a good time," and that the mood was "pretty light-hearted."

The video also showed Flores and Nava making hand gestures (which the parties characterized as "gang signs" only outside the presence of the jury). Flores identified Delgado, Nava, Termite, Estrada, and another member of their group ("Suspect") in a photograph, which showed all five individuals making the same hand gestures. No evidence before the jury identified the gestures as gang signs or Delgado's neck tattoo as a gang tattoo.

### 3. Delgado told Flores, Nava, and Termite that she was angry at Estrada for having hit her and Villareal, and said she wanted to "smoke" him. She smoked meth and became calmer.

Flores testified that after he tattooed Delgado, she began angrily discussing an incident when Villareal was pregnant (at least one month before the shooting), during which Estrada hit Villareal and also hit Delgado and took Delgado's car. Delgado said Estrada hit her (Delgado) "so bad that he could have killed her." Other members of their group were present during the

5

incident, but did not intervene. "[T]hat's what got her even more mad, that . . . none of that group stood up for her [Delgado]."

Delgado said she wanted to "smoke" Estrada. Flores understood she meant she wanted to shoot and kill him. He did not think she was serious, because she was drinking and he knew that Estrada was the father of Delgado's grandchild.

Flores tried to calm Delgado by telling her she was drunk and needed to chill. However, she continued "talking out of anger," complaining "It's not fair" and "How come the homies didn't jump in for me?" "She was feeling . . . basically betrayed . . . because nobody has stood up for her . . . that time that everybody seen that was going on."

Eventually, Delgado said "she was just going to chill" and left the room to change her clothes. When she returned, she heard Nava talking to Flores about an incident when Estrada hit Nava (separate from the incident when he hit Delgado and Villareal). Flores told Nava that they should confront Estrada about having hit Nava. Delgado became angry that Flores was willing to stick up for Nava but not for her.

Flores again told Delgado that she was drunk and needed to calm down. She went into a restroom and smoked meth. When she returned from the restroom, she was "more calm." She was no longer talking about domestic violence.

**4. Delgado agreed to drive Flores, Nava, and Termite to Estrada's house to confront him about having hit Nava (not having hit Delgado and Villareal). There, Delgado fired three shots into Estrada's head and one into his chest.**

Flores testified that after Delgado smoked meth and returned to the motel room, he and Nava told her that they were going to go to Estrada's house to confront him about having hit Nava. Delgado suggested that she and Termite should go too, and said that she would talk to Estrada after Nava confronted him.

Delgado drove herself, Flores, Nava, and Termite to Estrada's house. She parked around the corner from the house. Her decision to park there seemed "suspicious" to Flores and made him think that something was wrong. Flores saw Delgado wrap her neck with the burgundy bandana that he had seen wrapped around a gun in the first motel room's restroom.

The group entered Estrada's property through a back alley. As Flores walked through the alley in front of Delgado and Termite, he heard Termite "saying just to shoot him in the legs."

Nava called for Estrada to come out of his house. Estrada came out, and Flores asked why Estrada had hit Nava. He responded that Nava had lost a gun that belonged to Estrada. Nava was supposed to "jump" Estrada, but did nothing.

Flores began walking away. As he passed Delgado, he saw her showing a gun in her waistband. After he passed her, he heard Delgado tell Estrada that he fucked up. He then heard three or four gunshots.

Flores and the others ran back to the car, which Delgado drove back to the motel. En route, Delgado said that she "got

7

him" and that she had dropped the burgundy bandana. A burgundy bandana was found on the other side of a wall adjoining Estrada's property.

Surveillance video from a house neighboring Estrada's was played for the jury. It showed four people (three of whom Flores identified as himself, Delgado, and Nava) interact with Estrada before one of them (Delgado) shot Estrada. After the shooting, the four individuals ran around a corner and out of view.

Estrada was dead when first responders arrived. He had three gunshot wounds to his head and one to his chest.

### 5. Delgado told Flores that it was all planned. She told Villareal that she killed Estrada.

Flores testified that after returning to the motel, Delgado talked about how she had "got him." Flores told her that "it was wrong." Delgado "said it was all planned."[5]

As noted, Villareal was charged as an accessory after the fact. When she was in custody, she made recorded statements to an undercover informant posing as her cellmate. An audio recording of her statements was played for the jury. Villareal told the informant that her mother (Delgado) "caught him" (the victim was unspecified), but that Villareal did not know that "she did it" until Delgado told her. When Villareal was crying "[be]cause of the shooting," Delgado asked her if she "wanted to

---

[5] Flores was charged with Estrada's murder and testified while in custody. The jury received an instruction—which Delgado does not challenge on appeal—regarding how to evaluate Flores's testimony as a potential accomplice.

know," and when she said yes, Delgado told her that she (Delgado) killed him.

## B.    Jury instructions and closing arguments

The trial court denied Delgado's request to instruct the jury on the heat of passion theory of voluntary manslaughter (CALCRIM No. 570).  Delgado argued that the instruction was warranted by evidence that Estrada committed domestic violence against her daughter, Villareal.  The trial court concluded that the evidence was insufficient to support a finding that Delgado was acting under a heat of passion at the time she killed Estrada, because Estrada's most recent act of violence occurred three days earlier, and because the evidence indicated that Delgado acted on a desire for revenge rather than a heat of passion.

The trial court asked Delgado if she requested any other instructions.  Delgado said no.  She did not request, and the trial court did not deliver on its own motion, an instruction regarding how provocation may reduce murder from first to second degree (CALCRIM No. 522).

In closing, the prosecutor argued that Delgado, motivated by anger at Estrada for having hit Villareal and Delgado herself, premeditated and deliberated Estrada's murder, as evidenced by her telling Villareal days before the shooting that the situation with Estrada would be taken care of, her statement to Flores that she wanted to smoke Estrada, and her arming herself with a gun before taking Flores, Nava, and Termite to execute a surprise attack on Estrada.  Delgado argued that the prosecution failed to prove that she was the shooter.  Although she did not expressly address premeditation and deliberation, she argued that she was "really upset" about Estrada's domestic violence against Villareal,

9

and that a mother's actions to protect her daughter are based on instinct, not intent.

## C.    Verdicts and sentencing

The jury found Delgado guilty of first degree murder and found true the allegation that she personally and intentionally discharged a firearm, causing death.  The jury also found Delgado guilty of possession of a firearm by a felon.

Delgado moved for a new trial, arguing, as relevant to this appeal, that the trial court erred by admitting the video of her receiving a tattoo from Flores hours before the shooting.  She argued that because the tattoo was "gang related" and the video showed "hand gestures which can only be interpreted as gang signs," the video's admission violated an in-chambers ruling by the trial court to exclude gang evidence, and served no purpose other than to improperly suggest to the jury that the charges were gang related.

At sentencing, the trial court denied Delgado's new trial motion, concluding that the challenged video was "highly probative" because it supported Flores's credibility by showing Delgado interact with him and the other group members before the shooting, and that the video was not unduly prejudicial.

The trial court also denied Delgado's request to strike or reduce the firearm enhancement, which request Delgado based on her characterization of the shooting as a "crime of passion" induced by Estrada's domestic violence against Villareal.  The court concluded that the evidence showed, to the contrary, that the shooting was a "very calculated act" motivated more by Estrada's having hit Delgado herself—thereby disrespecting her

10

in the presence of fellow members of their group—than by his domestic violence against Villareal.

The trial court sentenced Delgado to 25 years to life on the first degree murder conviction, plus 25 years to life for the firearm enhancement, and stayed an additional two-year term on the conviction for possessing a firearm as a felon. Delgado filed a timely notice of appeal.

## DISCUSSION

### A. The trial court properly denied Delgado's request to instruct the jury on heat of passion.

Delgado argues that the trial court prejudicially erred by denying her request to instruct the jury on the heat of passion theory of voluntary manslaughter (CALCRIM No. 570).

Voluntary manslaughter is the unlawful killing of a human being "without malice" and "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "Voluntary manslaughter is considered a lesser, necessarily included, offense of intentional murder." (*People v. Choyce* (2025) 18 Cal.5th 86, 104.)

" ' "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 385 (*Thomas*).) " 'Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.' " (*Ibid.*)

"Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been

11

sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Enraca* (2012) 53 Cal.4th 735, 759; see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1225 (*Rangel*) ["the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection"].) "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.' " (*Enraca*, at p. 759; see also *Rangel*, at p. 1225 [" '[T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene' "].) " 'A heat of passion killing . . . is one caused by an unconsidered reaction to provocation rather than the result of rational thought.' " (*Thomas*, *supra*, 14 Cal.5th at p. 386.)

Here, Delgado does not argue that Estrada engaged in any provocation immediately before the shooting, when she, Flores, Nava, and Termite confronted him at his house. Rather, she argues that Estrada provoked her by committing acts of domestic violence against her daughter, Villareal, including—most recently—an act three days before the shooting.

We assume, arguendo, that Estrada's domestic violence against Delgado's daughter was sufficient provocation to satisfy the objective component of the heat of passion theory. However, we conclude that no substantial evidence supported a finding in Delgado's favor on the theory's subjective component, i.e., a finding that her fatal shooting of Estrada was an " 'unconsidered reaction' " to the domestic violence he committed days (and more) earlier " 'rather than the result of rational thought.' " (*Thomas*, *supra*, 14 Cal.5th at p. 386.)

Because Delgado did not testify, she cites only Flores's testimony to support her argument that she killed Estrada in an "impassioned state" brought about by Estrada's domestic violence. For two reasons, we conclude that Flores's testimony was not substantial evidence that at the time of the shooting, provocation by Estrada "bypassed [Delgado's] thought process to such an extent that judgment could not and did not intervene." (*Rangel*, *supra*, 62 Cal.4th at p. 1225.)

First, Flores's testimony and other uncontradicted evidence indicated that Delgado premeditated and deliberated the fatal shooting. Three days before the shooting, when Estrada committed his most recent act of domestic violence, Delgado dissuaded Villareal from giving Estrada's name to the police and told her it would be taken care of. At the motel on the night of the shooting, Delgado said she wanted to smoke (kill) Estrada for having hit Villareal and Delgado herself, armed herself with the same gun that Flores and Nava had left in a separate room, and concealed the gun in her waistband. After driving the other men to Estrada's house under the pretense that she would merely talk to him, she made the "suspicious" (to Flores) decision to park around the corner from the house. While she walked through the alley to Estrada's house, Termite told her "just to shoot him in the legs." Rather than shoot Estrada's legs as Termite suggested, which might have merely injured Estrada without killing him, Delgado fired three shots into his head and one into his chest. After returning to the motel, in response to Flores's protest that what she did was wrong, Delgado told him "it was all planned."

The foregoing evidence that Delgado premeditated and deliberated the fatal shooting, with a motive to exact revenge against Estrada for having hit Villareal and Delgado herself, is

13

inconsistent with a finding that the killing was an " 'unconsidered reaction' " to Estrada's provocation " 'rather than the result of rational thought.' " (*Thomas*, *supra*, 14 Cal.5th at p. 386; see also *People v. Carasi* (2008) 44 Cal.4th 1263, 1306 [premeditation and deliberation are "evidenced by planning activity, a motive to kill, or an exacting manner of death," and are " 'manifestly inconsistent with having acted under the heat of passion—even if that [premeditated and deliberate] state of mind was achieved after a considerable period of provocatory conduct' "]; *Carasi*, at p. 1308 [no substantial evidence supported heat of passion instruction, where defendant "exacted the ultimate revenge" by planning and executing fatal stabbing of his mother and ex-girlfriend, motivated by "long-simmering resentment towards them over family issues"].)

In other words, Delgado's anger over Estrada's earlier domestic violence against her daughter, standing alone, is not substantial evidence that she acted under a heat of passion when she exacted revenge by planning and executing a fatal surprise attack at Estrada's home. (See *Rangel*, *supra*, 62 Cal.4th at pp. 1200, 1225 [no substantial evidence supported heat of passion instruction, where defendant made " 'a concerted effort to plan and execute a surprise attack' " because he was angry that victim had grazed defendant's son's head with a bullet two weeks earlier]; *People v. Souza* (2012) 54 Cal.4th 90, 98-100, 115, 117 [same, where defendant planned and executed surprise attack against group of victims because one victim had forcibly removed defendant's mother from a house party about one hour earlier].)

Moreover, Flores's testimony and other evidence indicated that Delgado shot Estrada after any impassioned state induced by his provocation had subsided and her reason had returned.

14

(See *Rangel*, *supra*, 62 Cal.4th at p. 1225.)  As Flores testified—
and the video that Delgado recorded while receiving a tattoo from
Flores corroborated—Delgado was "having a good time" with
other members of their group when they first met at the motel,
two days after Estrada's most recent act of domestic violence.
Although Delgado eventually became angry when recalling
Estrada's violence against Villareal and Delgado herself (along
with the group's failure to stand up for Delgado), she then
smoked meth, calmed down, and stopped talking about domestic
violence.  It was *after* she calmed down that Flores informed
Delgado that he and Nava were going to Estrada's house to
confront him about a different incident, and Delgado seized the
opportunity to drive them there under a false pretense and to
launch a surprise attack.  Thus, the evidence indicated that
Delgado's anger sufficiently subsided before the shooting for her
reason to return, and that the shooting was " 'the result of
rational thought,' " not a heat of passion killing.  (*Thomas*, *supra*,
14 Cal.5th at p. 386.)

In short, we conclude that the trial court properly denied
Delgado's request for an instruction on the heat of passion theory
because no substantial evidence supported such an instruction.
We need not address the Attorney General's argument that the
instruction's omission was harmless.

## B.     The trial court did not err by failing to deliver, on its own motion, a pinpoint instruction on provocation.

Delgado argues that the trial court prejudicially erred by
failing to instruct the jury with CALCRIM No. 522, the pattern
instruction regarding how provocation may reduce the degree of
murder.

Evidence of provocation may reduce a murder from first to second degree by raising a reasonable doubt regarding whether the murder was premeditated and deliberate.  (*People v. Rivera* (2019) 7 Cal.5th 306, 328 (*Rivera*).)  "The issue is whether the provocation precluded the defendant from deliberating.  [Citation.]  This requires a determination of the defendant's subjective state."  (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295.)

"[A]n instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation, such as . . . CALCRIM No. 522, is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory."  (*Rivera, supra*, 7 Cal.5th at p. 328.)  "The trial court is not required to give such an instruction sua sponte."  (*Ibid.*)

Here, Delgado did not ask the trial court to deliver CALCRIM No. 522.  On appeal, she argues that her request for a separate instruction on heat of passion (CALCRIM No. 570, discussed above) should be deemed a request for CALCRIM No. 522 as well, because both instructions concern potential effects of provocation.  In the alternative, she argues that the omission of CALCRIM No. 522 affected her substantial rights and that her counsel's failure to request the instruction rendered his assistance ineffective.

Delgado cites no authority—and we are aware of none—supporting her claim that her request for a heat of passion instruction (an instruction on a lesser included offense of murder) constituted an implicit request for CALCRIM No. 522 (a pinpoint instruction regarding the degree of murder).  We conclude that because Delgado did not request a pinpoint instruction on provocation, the trial court did not err by failing to deliver one.

16

(*Thomas*, *supra*, 14 Cal.5th at p. 385 ["the trial court here did not err by failing to provide an instruction on provocation when one was not requested by defendant at trial"]; *Rivera*, *supra*, 7 Cal.5th at p. 329 ["[defendant] did not make a request for an instruction on provocation. The trial court did not err by failing to so instruct the jury"].)

We further conclude that the omission of CALCRIM No. 522 neither affected Delgado's substantial rights nor rendered her conviction vulnerable to challenge for ineffective assistance of counsel, because no substantial evidence supported a finding that provocation by Estrada precluded Delgado from premeditating and deliberating. On the contrary, as we have discussed in concluding that no substantial evidence supported Delgado's request for a heat of passion instruction, uncontradicted evidence indicated that Delgado *did* premeditate and deliberate the murder, and committed it after any passion induced by Estrada's provocation had sufficiently subsided for her reason to return. In the absence of substantial evidence supporting the instruction, we conclude that Delgado's counsel reasonably declined to request it, and its omission did not affect Delgado's substantial rights. Thus, the instruction's omission does not establish reversible error under any of Delgado's theories.

C.      **Delgado forfeited her objection to the admission of the tattooing video by failing to object at trial. Her counsel's failure to preserve the objection did not violate her right to effective assistance.**

Delgado argues that the trial court prejudicially erred by admitting a video, taken by Delgado hours before the shooting, of Flores giving Delgado a "gang" tattoo (a description of the tattoo

17

that was never used in the jury's presence).  She argues that the video was inadmissible under Evidence Code section 352 because its probative value was substantially outweighed by the potential for undue prejudice.  "The evidence barred by Evidence Code section 352 is evidence that uniquely causes the jury to form an emotion-based bias against a party and that has very little bearing on the issues of the case." (*People v. Thornton* (2007) 41 Cal.4th 391, 427 (*Thornton*).)

The Attorney General argues that Delgado forfeited her evidentiary objection on appeal by failing to object to the video in the trial court.  We agree.  Generally, " 'trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal.' " (*People v. Jasso* (2025) 17 Cal.5th 646, 674 (*Jasso*); see also Evid. Code, § 353, subd. (a).)

Delgado asserts that her trial counsel objected to the video, and cites an objection made outside the presence of the jury. However, the cited objection was directed to a proffered photograph (which does not appear in the record), not to the video.  In response to the objection, the trial court said:  "[L]et me think about it, and I'll get back to you guys."  The next day, the prosecution withdrew its request to admit the objected-to photograph, and proffered a different photograph, in which Flores had identified Delgado, Nava, Termite, Estrada, and another member of their group ("Suspect") in writing.  The trial court then overruled Delgado's counsel's objection that the second photograph was cumulative of the video.

Delgado's counsel did not object to the video—either when counsel objected to the photographs or when the prosecutor subsequently played the video for the jury during Flores's direct

18

examination. We conclude that by failing to object to the video under Evidence Code section 352 in the trial court, Delgado forfeited the objection on appeal. (*Jasso*, *supra*, 17 Cal.5th at p. 674; Evid. Code, § 353, subd. (a).)

Delgado argues, in the alternative, that her trial counsel's failure to preserve the objection for appeal violated her constitutional right to the effective assistance of counsel. " 'When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*Jasso*, *supra*, 17 Cal.5th at p. 675.) "Where a sound legal basis exists for the admission of evidence, an attorney is not ineffective for failing to object to its introduction." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1313 (*Seumanu*).)

We conclude that Delgado has failed to show that her counsel's performance was deficient, because an objection to the video under Evidence Code section 352 would have lacked merit. As the trial court indicated in denying Delgado's motion for a new trial, the video had substantial probative value because it corroborated Flores's testimony that Delgado socialized with him, Nava (one of Delgado's codefendants), and Termite in a motel room shortly before Estrada was fatally shot. By corroborating a portion of Flores's testimony regarding the events leading up to the shooting, the video bolstered the credibility of his testimony generally, including his identification of Delgado as the shooter

19

and his testimony that after the shooting, Delgado returned to the motel with Flores and told him it was all planned.  Thus, the video was probative regarding whether Delgado committed the murder and whether she did so with premeditation and deliberation.

As the trial court further indicated in denying the new trial motion, the video had little potential to unduly prejudice the jury against Delgado.  The video did not show Delgado engaging in any violent or offensive conduct.  Although it showed her receiving a neck tattoo, and further showed Flores and Nava making hand gestures, neither the video itself nor any other evidence before the jury identified the tattoo as a gang tattoo or the gestures as gang signs.  Indeed, the trial court excluded proffered evidence of gang affiliation.

Moreover, the same neck tattoo that Delgado received in the video was visible in her booking photo, and the same hand gestures shown in the video were visible in the photograph in which Flores identified Delgado and other group members.  Delgado's appellate briefs do not challenge the admission of those photographs—or any evidence other than the tattooing video.  She therefore forfeited any such challenge.  (See, e.g., *People v. Flores* (2024) 101 Cal.App.5th 438, 451, fn. 3; *People v. Stanley* (1995) 10 Cal.4th 764, 793.)  In the context of the unchallenged evidence before the jury, the video had no reasonable likelihood of causing the jury to "form an emotion-based bias" against Delgado.  (*Thornton*, *supra*, 41 Cal.4th at p. 427.)

For the foregoing reasons, we conclude that the video's probative value was not substantially outweighed by the potential for undue prejudice, and that Evidence Code section 352 therefore did not render the video inadmissible.  Accordingly,

20

defense counsel's failure to object to the video under that statute did not render his assistance ineffective.  (*Seumanu*, *supra*, 61 Cal.4th at p. 1313.)

Having rejected each of Delgado's claims of error, we need not address her claim that the cumulative effect of the asserted errors was prejudicial.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.